**NOBEL SCIENTIFIC INDUSTRIES, INC., Plaintiff,**

v.

**BECKMAN INSTRUMENTS, INC., Defendant.**

**No. B80–3073.**

United States District Court, D. Maryland.

July 23, 1986.

1314

Edward L. Blanton, Jr., and Kevin M. McGeady, Towson, Md., for plaintiff.

Richard L. Horn, of Chicago, Ill., and Dana N. Pescosolido, of Baltimore, Md., for defendant.

WALTER E. BLACK, Jr., District Judge.

THE COURT: Plaintiff Nobel Scientific Industries, Inc. brought this antitrust suit against Beckman Instruments, Inc. Beck-man has filed a motion for summary judgment (paper 166) on all aspects of the amended complaint and the issues have been voluminously briefed. Having reviewed the record and heard oral argument today, the Court is convinced that the motion for summary judgment must be granted.

The parties agree on most of the facts but differ on the legal conclusions to be drawn from those facts. The dispute centers around reagents which are used in chemical analyzers. The chemical analyzers are machines which process blood samples or other body fluid samples, analyzing them for various chemical components. These machines are sold to hospitals and laboratories which need to conduct such tests on a frequent basis.

Beckman makes analyzers, including both discrete analyzers and the ASTRA 4 and ASTRA 8, all of which are at issue in this litigation. The discrete, or dedicated, analyzers test for specific chemicals. Thus a glucose analyzer solely does testing for glucose. The ASTRA 4 and ASTRA 8, by contrast, have a broader range of capabilities. They can do multi-channel analysis, meaning that they can execute up to five or nine tests, respectively.

In addition the ASTRA machines can interrupt routine testing to do a stat test, a stat test being a priority or emergency test. Indeed the name ASTRA represents this capability since ASTRA is an acronym for "Automated Stat/Routine Analyzer." The ability to do quicker tests with faster results is especially important for emergency care in hospitals.

There are numerous companies that make analyzers and numerous different types of analyzers. Various analyzers exist that can do stat testing and discrete testing. Referring to the deposition of J. Lloyd Johnson, President of J. Lloyd Johnson Associates, Defendant's Appendix 1 at 126 to 131. In addition, there are many machines that can do multi-channel analysis, often doing many more tests than the ASTRA machines. Deposition of Johnson at 86 to 88 and 348. For example, the American Monitor Parallel analyzer could

run twenty three tests at once. Deposition of Michael Morrison, Product Manager at American Scientific Products, Defendant's Appendix II, at 31. By 1980, there were analyzers on the market from at least fourteen companies other than Beckman. Deposition of Ronald Kovach, Former Vice President and General Manager of Nobel, Defendant's Appendix II, at Exhibit C. Most notable were analyzers made by companies such as Technicon, DuPont, Instrumentation Laboratories and American Monitor. In fact, a market share chart for 1980 shows Beckman selling only 8.9 percent of all chemistry systems.

In order to run any of the tests on the Beckman machines or on other analyzers, various reagents are necessary. Beckman makes a complete line of reagents to do the tests on its analyzers. In addition there are a variety of other companies making reagents and many companies that are solely in the business of making reagents for use in the analyzers of various companies. The tests done are the same for the different analyzers and the reagents are thus somewhat similar. While the reagents have to be adjusted, the basic knowledge required to make them remains the same for all the machines.

Beckman has a variety of option plans for the purchase of instruments, reagents, repair service and supplies. None are required and many are similarly in use by other companies. First and most important is the "Answer-Pak" program. This is a rental program, under which Beckman supplies the necessary analyzer, reagents and service in return for a monthly rental payment based on the number of tests done on the machine. Such rental programs are very common in the industry. Deposition of Peter Blanchard, American Scientific Products, Defendant's Appendix I, at 48 to 50; Deposition of Douglas Johnson, Product Manager for American Technical System, Defendant's Appendix I, at 30 to 31. After 1983, due to unrelated legal developments, the Answer-Pak system was largely superseded by a "metered titled lease" program. This works in the same manner as the Answer-Pak except that over time, the customer acquires an equity interest in the analyzer. Overall, between 45 and 50 percent of those acquiring an ASTRA analyzer have used one of these rental systems. Defendant's Supplemental Answers to Plaintiff's First Set of Interrogatories. See also Deposition of Michael Whelan of Beckman, Defendant's Appendix II, at 78.

Other customers make use of cash discount programs. The ESP program, standing for Essential Supplies Planning, gives a cash discount of up to 25 percent off the list price on reagents. Another program, the CDP or Competitive Data Profile program, authorizes higher cash discounts for specific accounts in order to meet the prices offered by reagent competitors.

The ESP + 10 program is similar to the ESP program. ESP + 10, however, offers up to a 35 percent discount off the list price of future purchases of any Beckman goods or services. This is an "in kind" discount and can be used to purchase equipment or services, as well as reagents.

Beckman also offers various other services to its instrument and reagent customers. These include reduced rates on service contracts, seminars on using the equipment and a hotline to solve technical problems. There is some dispute as to the availability of these services, at least without paying a fee, for those who do not use Beckman reagents.

Beckman is, however, not the only seller of reagents for its analyzers. As stated before, many companies are in the business of making reagents for analyzers. Nobel is one of those competing companies and one of several companies, including also Hi-Chem, Fisher Scientific, and others that manufacture reagents specifically for use in the Beckman analyzers. Despite the presence of these various reagent companies, Beckman has allegedly been able to retain a market share of more than 95 percent of the reagents used with its ASTRA analyzers and more than 85 percent of the reagents used with the Beckman discrete analyzers.

Nobel alleges that this is monopolization of the reagent market in violation of the Sherman Act. In addition, Nobel alleges

that the reason Beckman has so much of the reagent business for its analyzers is that there are tying agreements in violation of the Clayton Act. Nobel says that the Beckman analyzers are a unique and valued commodity, which constitute a market unto themselves. Beckman has allegedly tied purchase of its analyzers or other services to purchase of Beckman reagents through the various discounts and package rental plans. Nobel claims that Beckman has market power over analyzers which it has used to force its customers to buy its reagents. Plaintiff also points to a refusal of Beckman to sell an ASTRA analyzer to Nobel and claims that this constitutes a refusal to deal in violation of the Sherman Act.

■ Summary judgment can only be granted under Rule 56 of the Federal Rules of Civil Procedure if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 467, 82 S.Ct. 486, 488, 7 L.Ed.2d 458 (1962). Summary judgment is used sparingly in complex antitrust cases, citing *Poller* at page 473, 82 S.Ct. at page 491. Nevertheless, it is appropriate at times and there must be sufficient evidence supporting the complaint to warrant a lengthy jury trial. *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253 at 289–90, 88 S.Ct. 1575 at 1592–93, 20 L.Ed.2d 569 (1968); *Terry's Floor Fashions, Inc. v. Burlington Industries, Inc.*, 763 F.2d 604 at 610 (4th Circuit, 1985; *Alphin Aircraft, Inc. v. Henson*, 1984–2 Trade Cases (CCH) Section 66, 161 at page 66, 496 (D.Md.1984) [Available on WESTLAW, DCT database]. In the most recent antitrust case in the United States Supreme Court, the opinion emphasizes that summary judgment can be appropriate in antitrust litigation, in particular if the claim "makes no economic sense." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348 at 1356, 89 L.Ed.2d 538 (1986).

In an opinion of the Supreme Court on June 25th of this year, the Court further stated that "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Cartrett*, 477 U.S. 317, ——, 106 S.Ct. 2548, 2550, 91 L.Ed.2d 265 (1986) and see also *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

■ It should also be noted that summary judgment is appropriate for litigation where definition of the relevant product market is at issue. When a Court finds that the correct market definition precludes plaintiff's claims summary judgment should be granted. *Stearns v. Genrad, Inc.*, 752 F2d 942 at 946 & 7 (4th Circuit 1984).

As noted before, the dispute at this stage of the litigation is not factual. Few if any facts are disputed. Rather the parties differ on the legal conclusion to be drawn from the facts and whether the facts as given constitute an antitrust violation.

Nobel first alleges that Beckman has a monopoly of the reagent business, or attempted to monopolize that business, in violation of Section 2 of the Sherman Act. Section 2 states that "every person who shall monopolize or attempt to monopolize any part of the trade or commerce among the several States" shall be guilty of an antitrust violation.

The classic formulation of the standard for finding a monopoly is set forth in *United States v. Grinnell Corp.*, 384 U.S. 563 at 570 & 71, 86 S.Ct. 1698 at 1704, 16 L.Ed.2d 778 (1966).

"The offense of monopoly under Section 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen or historic accident."

The Court is convinced that if monopoly power exists, then genuine issues of material fact exist as to the second element, acts taken to acquire or maintain that power. Nobel has alleged that Beckman refused to sell an instrument to them, admittedly to try and avoid reagent competition. Deposition of Larry Cohen, Beckman Marketing Specialist, Defendant's Appendix I at 89. In addition, Nobel says that customers were told the hotline service would be discontinued if they stopped using Beckman reagents. Deposition of M. Elizabeth McGee, Clinical Laboratory Administrator, St. Francis Hospital, Plaintiff's Appendix II at 14–20. There are also allegations that Beckman tried to "botch" test results of other reagents on Beckman instruments. Deposition of Keven Keene, Beckman Marketing Specialist, Plaintiff's Appendix II at Exhibit 1. In short there are issues of fact as to whether Beckman's actions, in order to maintain its sales, were proper.

■ This does not end the inquiry, however, because in order to be liable under Section 2, Beckman must have, in fact, possessed monopoly power in the reagent market. If monopoly power did not exist, then Beckman's acts, while arguably harsh or overly aggressive, would not subject Beckman to liability.

■ A similar analysis holds for an attempt to monopolize. "There is no attempt to monopolize within the prohibition of Section 2 of the Sherman Act unless there is both an intent to monopolize and a 'dangerous probability' that an actual monopoly will be achieved." *White Bag Co. v. International Paper Co.*, 579 F.2d 1384, 1387 (4th Circuit 1974); *Satellite Television v. Continental Cablevision*, 714 F2d 351, 358 (4th Circuit 1983). Nobel has raised issues of fact, by virtue of its depositions, as to what was Beckman's intent. Unless, however, the market is such that monopoly might be achieved, there can be no liability. Again analysis of the relevant reagent market is most important for purposes of this summary judgment motion.

The motion to dismiss the Section 2 claim therefore relies on market definition, in order to see whether monopoly power exists or is a dangerous probability. In general "the plaintiff in an antitrust case bears the burden of proof on the issue of the relevant product and geographic markets." *Satellite Television*, 714 F.2d at 355. There is no debate over the relevant geographic market which presumably is the whole United States. What is important in this litigation is instead the proper product market.

Market definition has often been the subject of litigation. In *United States v. E.I. duPont de Nemours and Company*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956), a leading case, the Supreme Court held that cellophane did not constitute a market to itself. The market instead was flexible packaging materials because other wrapping papers, while not identical, could substitute for cellophane. "In considering what is the relevant market for determining the control of price and competition, no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that 'part of the trade of commerce', monopolization of which may be illegal." Quoting from 395, 76 S.Ct. at 1007. In addition, the Court noted that the cross-elasticity of demand was an important factor to be considered. P. 394, 76 S.Ct. p. 1007. In other words, if the price of cellophane were to rise too high, consumers would switch their demand over to another form of wrapping material and sales of cellophane would decline. In a monopolistic market, by contrast, cellophane prices could rise without an effect on demand for them.

■ Use of the term "product market" has specific connotations for antitrust purposes. Much confusion in this litigation seems to have arisen from the casual use by hospitals and by reagent manufacturers and businessmen, of the term "market" in their ordinary business reports and strategy papers. Product markets for antitrust analysis depend on cross-elasticity and interchangeability, and so the fact that a company may refer to a "market" does not necessarily mean that its reference will be

to a market for purposes of the Sherman Act.

Nobel argues that the market must be defined narrowly in terms of seven specified chemical tests done on a stat basis and must therefore, in essence, be the market of reagent solely for use on the Beckman instruments. Nobel argues that the Beckman machine is unique based on the ability of the Beckman machines to do stat testing, to interrupt routine tests for stat tests and to do seven specified chemistry tests for glucose, BUN, creatinine, sodium, potassium, chloride, and bicarbonate, that Nobel claims are most often requested. Nobel claims that there is one market for instruments which consists of merely the Beckman instruments and that there is a separate market for reagents for the Beckman instruments.

This is an extremely narrow market definition, essentially limited to the products of one company. Under a broader market definition, including other companies and other analyzers, or including more than just stat testing on seven chemicals, there can be no claim of monopoly or of attempted monopoly. If other analyzers compete effectively with the Beckman analyzers, then the relevant product market must include the sale of reagents for those analyzers as well. As a result, Beckman's market share or potential market share, would not give rise to liability for monopolization or attempted monopoly of the reagent market.

■ The parties do not debate the facts. They merely argue as a matter of law whether the facts as given mandate a narrow market definition, or a broader one. The Court is convinced that the market cannot be defined as narrowly as Nobel would desire. There is no question that the ASTRA analyzers were very successful and are considered among the best in the industry. Nevertheless, there is uncontradicted evidence that other machines existed in the past and exist now that compete with the ASTRA instruments and that do the same functions as the Beckman analyzers. In addition, there is no market consisting merely of stat testing for the seven chemi-

cals. In general customers can choose between various alternative machines or combinations of machines to do various functions and if the price of reagents is too high, then laboratories will switch to other analyzers in order to cut costs. The reagent market therefore must be viewed as including the market of reagents for various competing analyzers and chemical tests and cannot just be limited to the Beckman machines.

The cost and availability of the reagents and of other services needed to run an analyzer are important factors for a hospital or laboratory in deciding what machine to purchase. Deposition of Bruce Hamilton, Johns Hopkins University, Defendant's Appendix I, at 45 & 6 and 75 & 6; Deposition of Rosemary Hines, Chemistry Laboratory Manager at Francis Scott Key Medical Center, Defendant's Appendix I, at 21 & 22. For example, as Dr. Hamilton, an expert for Nobel, stated:

Q Would there be a relationship which would mean that the higher the price of the reagents, the fewer sales of instruments could be expected?

A Yes.

Q And conversely, the lower the price of the reagent, the greater the number of sales of the instrument?

A Correct.

Q So it is clear that the cost of reagents is something that a hospital considers when it looks at instrument acquisition?

A That is my understanding, yes.

The uncontradicted testimony indicates that if the price of reagents or other services rises too high, then the hospitals and laboratories will buy other instruments. One hospital specifically rejected a Kodak analyzer due to high reagent prices. Deposition of H. Patrick Coveault, St. Francis Hospital, Defendant's Appendix I, at 27. This shows that there is interchangeability of the chemical analyzers and that the market is responsive to changes in prices of reagents. If the Beckman reagents cost too much, customers will cease using Beckman machines.

In addition, the Beckman analyzers, while highly regarded, are not so unique

that they face no competition and cannot be replaced by other machines. Nobel stresses that the Beckman analyzers do stat testing, can interrupt routine tests for stat tests and can test for the seven specified chemicals. None of these capabilities is unique.

Deposition testimony indicates various analyzers in competition with the ASTRA machines such as the duPont ACA system. Deposition of Cohen at 88. A 1980 chart indicates that Beckman only sold 8.9 percent of all chemistry systems and that at least fourteen companies sold such systems. Deposition of Kovach at Exhibit C. While the Beckman machines can perform stat tests, other machines can also do this and some, such as the American Monitor Parallel, are faster. Deposition of Gayden Gauthier of Beckman, Defendant's Appendix I, at 17. In addition, there are various machines that can interrupt routine testing to do stat testing. Uncontradicted testimony states that:

Q But it has the ability to interrupt the routine testing and give you a stat if one is needed?

A Yes.

Q Are there any other instruments on the market that had that capability in that period, 1979 to 1983?

A Yes.

Q What other instruments?

A DuPont, ACA, Yellow Springs Instrument had an analyzer, stat analyzers. You're talking specifically about the stat interrupt capability?

Q Yes, sir.

A '83; I.L. I.L. had a system that would do it, Instrumentation Laboratories.

Q And you don't know of any period of time when the ASTRA was the only instrument that offered that ability to do seven different chemistries on both a routine and stat basis?

A No.

Deposition of Harold Peper of Beckman, Defendant's Appendix II, at 112 & 13. Other testimony supports this. Deposition of Patricia Sisson of Beckman, Defendant's Appendix II, at 34 and Deposition of Frederick Herr of Beckman, Defendant's Supplemental Appendix at 98.

It is also instructive to look at the various studies and memoranda which both parties have presented to the Court. These often have comparisons of various analyzers, thus pointing out that the ASTRA is not in a separate market and that other machines are competing for the same business. A hospital, for example, will compare the merits of the ASTRA versus other machines. See, for example, the deposition of Dale Thompson, Defendant's Appendix II, at Exhibit 1; Deposition of Gary Cabana, Veteran's Administration Medical Center, Defendant's Appendix. I, at 31; Deposition of Coveault at 26 & 7. In addition, it is suggested that many hospitals and laboratories own several analyzers in order to do varied tests on many samples at once. Therefore, combinations of equipment might be sought by a customer and not one analyzer to solve all testing needs. One hospital study, for example, recommends buying both an ASTRA 8 and also analyzers made by Abbott Laboratories. Depositions of Thompson at Exhibit 1. All of these facts show that the Beckman analyzer is not its own separate market.

Defining the product market in terms of the seven specified chemical tests is also overly restrictive. The evidence shows that many machines can do many more tests than the ASTRA 8. Machines doing twenty or more tests are routine. In addition, few, if any, of the analyzers available are specifically limited to doing the seven named tests. Some analyzers are valued for the number of tests they can do, some for their speed, some for their cost, and some for other features. All of the machines, however, compete for the same contracts and business. Therefore one cannot separate out the competition to sell reagents for only these seven tests. Reagent competition is for selling reagents for any of the tests that the machines can run. To sell reagents for an ASTRA 8, which can do nine tests, a company must sell reagents for all of the desired tests and not just for seven of them.

The Court would also note that if the market were to be defined merely in terms of the seven named, then the discrete analyzers and the ASTRA 4 might not be in the product market. Only the ASTRA 8 can do all seven of the tests at the same time. Plaintiff nowhere suggests that its complaint is limited to the ASTRA 8.

Nobel, at times, is attempting to define the market as a subset of certain functions the ASTRA machine can perform. Thus Nobel says that there is a separate market for stat testing, or stat interrupt testing, of the seven specified chemicals, ignoring the fact that the exact same ASTRA machine also at the same time does routine testing, and also tests for other chemicals besides the specified seven. In general, this is true for all analyzers. The same machines do stat testing as do routine testing, and do tests on the seven specified chemicals as for many other chemicals. A machine would be evaluated in the industry for its overall qualities in all areas, or as part of a system combined with other analyzers and not merely on one aspect alone. In addition, while some tests may be more common, a lab may need the capability to do up to a hundred or more different types of tests. The evidence in the record thus establishes no basis for a market consisting of only one of various functions the Beckman analyzer can perform, ignoring all other work done by the machine.

Just as there is no separate market of analyzers doing stat testing on the seven chemicals, there can be no separate market of reagents in this area. It is agreed that the reagents used to do the stat tests are the same as for the routine tests, so that the reagent markets cannot be distinguished in theory or in practice. The tests are the same and only the timing differs. In addition, there is no evidence, as noted before, that reagent companies limit themselves to selling reagents for only seven tests. The reagent market must be broader.

Nobel's monopoly claim "makes no economic sense," as it attempts to set out a separate market for reagents for the Beckman equipment. The market cannot be defined so narrowly. All evidence suggests that different machines had different characteristics and different advantages and disadvantages and that they competed against each other in the eyes of the industry. The evidence is also uncontradicted that other machines had the same qualities, such as stat interrupt capability that Nobel claims are unique and distinctive in the Beckman analyzers.

Given this competition in the analyzer market, the reagent market, which seems to be distinct, must include reagents for all competing analyzers and not just for the Beckman instruments. This is emphasized by the fact that if the overall cost of operating an analyzer, whether due to reagent cost, service costs or otherwise, is too high, then a hospital or lab will switch to purchase of another company's equipment. In addition, the same chemicals are used for stat as for routine testing and the reagent companies do not limit themselves to only making seven reagents. Interchangeability and the cross elasticity of demand test, have been met.

The fact that Beckman had a high percentage of sales of reagents for its own analyzers is not unusual. The manufacturer of the analyzer generally held an advantage in the reagent market for its own machine, since it is most convenient to buy from the manufacturer and seems a safe alternative. Deposition of Blanchard at 32. As noted by Vincent Mihalik of American Hospital Supply Corporation, which is associated with Nobel,

A Most customers would prefer to buy the reagents of the manufacturer who makes the instrument.

Q Why is that?

A Less concern over if they have a problem, having to track down whether it's an instrument problem or reagent problem.

Deposition of Vincent Mihalik, Defendant's Appendix II at 11–12. Thus while Beckman and other manufacturers may have often done well selling reagents for their machines, there would at a minimum be competition over what machine to use,

based on the overall costs of an analyzer, including the reagent costs.

It is also noteworthy that there is overwhelming evidence that the market for reagents in fact had much competitive activity, including price competition, belying any claim of monopoly or dangerous possibility of monopoly. Beckman dominated sales of reagents for its machines but the presence of strong competitive pressures suggests that the market may have been broader. While perhaps not determinative, the evidence is worth noting.

There are numerous companies, perhaps thirty or more, marketing reagents, and numerous companies that include reagents for the Beckman machines in their line of products. Deposition of Blanchard at 22–29. Reagents for one analyzer can be readily adapted for use in another machine. Deposition of Ronald Pilchik of Nobel, Defendant's Appendix II, at 12–15; Deposition of Morrison at 61 & 74. The companies making reagents for Beckman analyzers include companies such as Nobel, Hi Chem and Fisher.

These companies seem to pose a competitive threat to Beckman. A Vice President of Marketing for a company selling Nobel reagents stated that "Hi-Chem is already in the marketplace doing a very good job in competing with Beckman. Nobel and Hi-Chem both do compete very well with Beckman." Deposition of Vincent Mihalik, Defendant's Supplemental Appendix at 89. In addition, internal Beckman memoranda stress competitive pressures, stating that "the ASTRA reagent marketplace is extremely competitive," and noting "the stiff competition that has crept upon us in recent weeks." Deposition of Dennis Gorman, Plaintiff's Appendix I; Deposition of Philip Shugart, Plaintiff's Appendix II at Exhibit 5. While the memoranda standing alone would not be conclusive, along with other evidence they suggest the pressures in the reagent business.

Price competition is intense. Reagent companies are selling the chemicals for large discounts off of list price. A 55 to 60 percent discount by Nobel was "not extraordinary." Deposition of Thomas Carey of Nobel, Defendant's Appendix I, at 589–90. Other indications are that discounts by Nobel have been 70 to 82 percent off list price and that other companies discount 60–80 percent off of list. See, for example, the deposition of Gregory Gerhardt, Johns Hopkins University, Defendant's Appendix I at Exhibit 3; Deposition of Roger Brown of Beckman, Plaintiff's Exhibit I at Exhibit 12, pages 3 & 4 and Deposition of Gauthier at Volume I, Exhibit 6.

There is also evidence of customers switching service from Beckman reagents to those of Nobel or other competitors for price and other reasons. One laboratory supervisor stated that his hospital had switched to Nobel reagents largely because "I felt I got better service" from Nobel. Deposition of Gary Cabana, Veteran's Administration Medical Center, Defendant's Appendix I, at 40 & 41. One Beckman memorandum stated that "agreements lost to competitive reagents are increasing significantly," nearly quadrupling over the course of one year. Deposition of Al Muense, Defendant's Appendix II, at Exhibit 3.

Beckman, in response, also had to cut prices. The CDP program was specifically directed at lower reagent prices of competitors and allowed discounts for competitive accounts above the usual 35 percent maximum. Discounts by Beckman exist at least up to 65 percent off of list price. Deposition of Richard Cook of Beckman, Defendant's Appendix I, at 14.

There is no evidence of predatory pricing and of Beckman selling below its cost to try and dispose of competitors. In addition, while Beckman's list price might have been high, it increasingly lowered its actual selling price to that of its competition, not typical of a company with monopoly power.

■ A Court must be skeptical of attempts to narrow the market merely to the products of the defendant. "In defining the relevant market, the Court must look beyond the particular commodity produced by an alleged monopolist because the relevant product market for determining monopoly power or the threat of monopoly control depends upon the availability of

alternative commodities for buyers." *Fount-Wip, Inc. v. Reddi-Wip, Inc.*, 568 F.2d 1296, 1301 (9th Circuit 1978). The "natural monopoly" of a manufacturer in his own products is not an antitrust violation. *Spectrofuge Corp. v. Beckman Instruments, Inc.*, 575 F.2d 256 at 282 (5th Circuit 1978), *cert. denied* 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979).

Many cases have rejected a narrow definition of product market, limited to one commodity. *See for example, Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480 (5th Circuit 1984) (hotel rooms); *Spectrofuge Corp. v. Beckman Instruments, Inc.*, relating to centerfuges; *Reisner v. General Motors Corp.*, 511 F.Supp. 1167 & 1179 (S.D.N.Y.1981), *affirmed* 671 F.2d 91 (2d Cir.1982), *cert. denied* 459 U.S. 858, 103 S.Ct. 130, 74 L.Ed.2d 112, involving automobiles; and *Cal Distributing Co. v. Bay Distributors, Inc.*, 337 F.Supp. 1154 at 1159 & 9 (M.D.Fla.1971), involving wines.

In addition, two courts have rejected the argument that IBM plug compatible computer equipment constituted a relevant product market. *Telex Corp. v. IBM*, 510 F.2d 894 (10th Cir.1975), *cert denied* 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244 (1975); *ILC Peripherals Leasing Corp. v. IBM*, 636 F.2d 1188 (9th Cir.1980), *cert. denied* 452 U.S. 972, 101 S.Ct. 3126, 69 L.Ed.2d 983 (1981). Just as items to be used in the IBM computers are not a separate market, merely because the IBM computers are popular, so too the reagents to be used in the Beckman instruments should not be a separate market. The arguments are parallel, as should be the result.

Another oft cited case is *General Business Systems v. North American Philips Corp.*, 699 F.2d 965, 971–75 (9th Cir.1983), which is discussed in the briefs at greater length. This case follows the same reasoning and held that computer cards to be used in a Philips computer system were not a separate market. If the cost of the cards increased too much, then customers could and would switch to use of other computers. This again is similar to the analyzers, because increased costs of the reagents can cause customers to buy other instruments.

There are limited exceptions to the rule against having a market that is related to only one product. "The exception applies when the manufacturer of the unique product uses his control over one market, or level of competition, to eliminate competition at another level or submarket." *Domed Stadium Hotel*, 732 F.2d at pages 488 and 9. This exception is rarely applied, as seen in the cases already noted. In addition, there is no evidence in this case that the Beckman analyzers are so unique, and have such control over the instrumentation market, that the reagents for those analyzers forms a distinct product market. To the contrary, many customers consider and choose machines other than those of Beckman. They balance the merits of various machines and will choose other analyzers if reagent costs or other costs are too high.

The relevant product market must include reagents for machines other than the Beckman analyzers. Many analyzers are in competition, and are reasonably interchangeable by hospitals and labs. The reagent companies make reagents for different analyzers and there is no separate market limited to the reagents for the Beckman machines.

■ Plaintiff also alleges that there is a violation of Section 1 of the Sherman Act, but devotes little attention in its complaint or briefs to this issue. Section 1 requires a "contract, combination or conspiracy, in restraint of trade or commerce." In addition to showing concerted action, and not merely unilateral acts,

> a successful plaintiff must also show: (1) that the conspiracy produced adverse, anti-competitive effects within the relevant product and geographic market; (2) that the objects of and conduct pursuant to the conspiracy were illegal; and (3) that the plaintiff was injured as a proximate result of the conspiracy.

*Terry's Floor Fashions, Inc. v. Burlington Industries, Inc.*, 763 F.2d 604 at 610, note 10 (4th Cir.1985).

Nobel's allegations are all directed at unilateral action by Beckman to try and secure and maintain reagent business. While the object of Beckman's actions were hospitals and laboratories, there was no concerted action with those customers. The customers were, at worst, merely victims, and the fact that a company agreed to buy reagents from Beckman cannot, by itself, make that company part of an illegal combination or conspiracy. While Nobel makes conclusory assertions of concerted action, the Court finds that the only evidence in the record is of unilateral action.

The Answer Pak contracts, and contracts for service or reagents can, however, arguably be viewed as illegal tying arrangements, subject to the strictures of Section 1. Since Section 3 of the Clayton Act, by its terms, only applies to tying of goods, Section 1 of the Sherman Act has been used to stop tying of services, such as the hotline and service contract tying alleged here. Therefore, to the extent there may be a violation of Section 1 of the Sherman Act, it would be through an illegal tying arrangement. The analysis is the same as for the Clayton Act and both will therefore be discussed together.

Section 3 of the Clayton Act applies to "goods, wares, merchandise, machinery, supplies or other commodities, whether patented or unpatented." It therefore applies to the Beckman instruments, reagents, and replacement parts but not to the service contracts. The section goes on to say that for such items,

> It shall be unlawful for any person to lease or make a sale or contract for sale for use, consumption, or resale, or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the products of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

This language forbids tying arrangements between two products. As the Supreme Court set out in *Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 5 & 6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958), a tying arrangement may be defined as an agreement by a party to sell one product but only on the condition that the buyer also purchases a different or tied product. They are unreasonable in and of themselves whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a 'not insubstantial' amount of interstate commerce is affected.

■ There need not be an explicit condition that the buyer of the tying product buy the tied product. "Separate availability will not preclude antitrust liability where defendant has established its pricing policy in such a way that the only viable economic option is to purchase the tying and tied products in a single package." *Ways and Means, Inc. v. IVAC Corp.,* 506 F.Supp. 697, 701 (N.D.Cal.1979), *affirmed* 638 F.2d 143 (9th Cir.1981), *cert. denied* 454 U.S. 895, 102 S.Ct. 394, 70 L.Ed.2d 210.

Beckman sells its ASTRA 4, ASTRA 8 and discrete analyzers separate from the reagents and service plans. Nobel alleges, however, that even though buying the reagents is not required, the price structure on the Answer Pak and the other discounts makes any other option not feasible.

■ For a tying arrangement to exist, there must be both a tying product and a tied product. The tying product in this litigation should be the Beckman analyzers, and the tied product the reagents.

Nobel seems to also allege that the service contracts, parts, hotline services, or other related items, might be the tying products, although the complaint itself does not state this contention nor give any factual support for it. The problem with using these other items as the tying product is that they have no market power independent of that for the analyzers. There is no evidence of consumer demand

for these items and thus of their market power or leverage, independent of consumer desire to purchase analyzers. At best, the market power is derivative, and would be equal to that for the machines.

While the Court feels that only the instruments can be the true tying product, the analysis would be the same even if other tying products are involved. The analysis to follow is therefore meant, even when not stated explicitly, to be equally applicable no matter which Beckman product is involved.

It should also be noted that the reagents can be the only tied product. Nobel does not allege that it competes to supply service contracts or hotline service for users of Beckman instruments. There is no allegation or evidence of a substantial lessening of competition, except perhaps as regards makers or reagents. This is the only possible allegation. There can be no tie to service contracts to parts or to hotline service.

Therefore, at a minimum, any alleged tying must involve a combination of reagents with either instruments or some other Beckman item, such as through the Answer Pak or the ESP + 10 service. Mere cash discounts on reagents, such as the CDP program, or the ESP program, which does not allow "in kind" discounts, cannot constitute tying.

■ There are various reasons that Beckman's actions do not, as a matter of law, constitute illegal tie-ins. First, no tying arrangement exists if there is freedom to choose whether to buy the two products separately or as a unit. Where the buyer is free to take either product by itself, there is no tying problem even though the seller may also offer the two items as a unit at a single price." *Northern Pacific Railway*, 356 U.S. at 6 n. 4, 78 S.Ct. at 518 n. 4. Thus the Supreme Court has consistently approved of discount packages and price competition through such sales.

If each of the products may be purchased separately in a competitive market, one seller's decision to sell the two in a single package imposes no unreasonable restraint on either market, particularly if competing suppliers are free to sell either the entire package or its several parts. Buyers often find package sales attractive; a seller's decision to offer such packages can merely be an attempt to compete effectively.

*Jefferson Parish Hospital District No. 2 v. Hude,* 466 U.S. 2, 104 S.Ct. 1551, 1558, 80 L.Ed.2d 2 (1984).

Here the evidence is undisputed that the items could be bought separately. There are also various package deals available by Beckman and by other suppliers, and different packages are priced to compete with various needs. There is, however, no evidence of any one package having dominance or of package purchases being the only viable option. For example, of all the analyzer business done by Beckman, only 45–50 percent involve Answer Pak or other rental programs. Other customers use another reagent program or buy their reagents from another supplier. In *Ways and Means v. IVAC,* another medical supply case, the court found that when 25 percent of all purchases were made outside of an alleged tying program, then as a matter of law, separate purchase of the products was a viable alternative and no tying existed. That's a citation to pages 702 & 3. By this reasoning, no one discount program by Beckman, standing alone, can be the tie-in, and the variety of options available to customers suggests that even as a group, there is no tie, but rather merely a range of competitive alternatives.

The evidence points to the fact that the discount plans were "merely an attempt to compete effectively." *Jefferson Parish,* 104 S.Ct. at 1558. "The essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." This essential characteristic is not present. In this case, the customers definitely want to and have to purchase reagents. In addition, if they want to purchase them elsewhere, they can, and there are many different discount plans

available by which to purchase the reagents.

It was noted previously that the market for reagents is characterized by frequent price cuts, and discounts of 60 to 70 percent off of Beckman's list price. The net result is that the customers buy reagents more cheaply. Nobel argues that for the Beckman package discounts, the package costs less than buying the individual items separately. While this may at times be true, this is not crucial. First, there is no evidence of predatory pricing, but only of Beckman trying to meet the prices of its competition. In addition, the packages themselves are in competition with other packages.

Beckman is not the only company offering package deals involving reagents and other goods. Most other analyzer companies also have rental programs through which the customer can get a whole chemistry system. In addition, the reagent companies offer package deals similar to those offered by Beckman. The record shows, for example, that the reagent company, Scientific Products, offered a discount program where purchases of reagents resulted in credits towards acquiring other reagents, instruments, or other products. Deposition of Mihalik at 33 & 4. In this way, Scientific Products managed to take an account away from Beckman by offering an Apple computer in return for purchasing Nobel reagents. Deposition of Cabana at 39–41. Alpkem also offers service and parts, as well as reagents and instruments, to its customers. Deposition of Mihalik at Ex. 12. Reiss Technical Services, as well as Laboratory Performance Specialists, did service on ASTRA analyzers. Deposition of Arthur Smith, Defendant's Supp.App., at 40. Beckman's package plans, therefore, are in competition with other packages from other manufacturers, who want to take away Beckman's business.

The fact that a package is inexpensive does not mean that it is unlawful. It may merely be a sign of effective competition. Nobel disputes the low price of service contracts to those using Beckman reagents and the easier use of the hotline service.

Beckman offers undisputed evidence, however, that it was easier to provide hotline and other service to those using Beckman reagents, because Beckman knew more intimately the characteristics of its own reagents. See, for example, the Deposition of Gayden Gauthier at Vol. I, pp. 23–7.

The characteristics of the different discount plans offered by Beckman also suggests that they are done for competitive reasons and not to use market power over analyzers, parts, or service, to force purchase of Beckman reagents. Several of the package deals, in particular the CDP and ESP plans, only involve purchase of reagents and therefore, cannot be an illegal tie. The ESP + 10 plan involves "in kind" discounts on future purchases of any Beckman products, but the discounts can, if desired, be used solely to purchase more reagents. Therefore, the ESP + 10 program might only involve one product, negating any suggestion of a possible tie.

The Answer Pak program and metered titled lease plans involve rental payments on a per test basis. The purchase is of a package, including the analyzer, reagents and necessary service. Since the components are not paid for separately, these plans would probably cater to different buyers, for whom per test payments are more economical. Again, most analyzer companies offer similar programs and only about half the ASTRA customers use one of these Beckman plans.

Finally, the ASTRA Users Club includes hotline service, newsletters, seminars, and other benefits, but no discounts on purchases. It is an optional program and can only be joined after purchases of Beckman equipment have already been made.

Overall, the nature of Beckman's discount plans, as well as the presence of competition for the reagent business, and the frequent price cuts by both Beckman and by Nobel and others, strongly suggest that no tying arrangement is or was occurring. Instead, Beckman's actions must be seen as competitive with the actions of other companies, and the discount plans themselves have no aspects that can be considered unlawful.

There is also no tying because there is no tying product with sufficient economic power to "substantially lessen competition or tend to create a monopoly" in the reagent market. In order for an invalid tie to exist, Beckman must have had sufficient economic power with regard to the instruments or other items to cause purchases of reagents. This once again relates to market definition, and an analysis of what is the product market for the Beckman machines.

■ The Court, at the outset, rejects plaintiff's claim that no evidence of economic power is necessary to establish tying under Section 3 of the Clayton Act, in support of which they cite *Advance Business Systems and Supply Co. v. SCM Corp.* 415 F.2d 55, 62 (4th Cir.1969). Plaintiff argues that if a "not insubstantial" amount of commerce is restrained, then the tying is unlawful without further inquiry. *Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 608–09, 73 S.Ct. 872, 880, 97 L.Ed. 1277 (1953).

This argument runs into various problems. First, *Advance Business Systems* assumes that the alleged tying is, in fact, restraining the commerce it affects, because if not, the Clayton Act could not be violated.. Such restraint of commerce does not always occur, however, since at times, tie-ins, through package sales or discounts, can be offered as themselves a form of price competition. Therefore, the *Advance Business Systems* analysis can only be effective for times when a restraint on commerce can be assumed.

The Supreme Court has noted this in its most recent pronouncements in the tying field. In *United States Steel Corp. v. Fortner Enterprises, Inc.,* 429 U.S. 610, 97 S.Ct. 861, 51 L.Ed.2d 80 (1977) (known as *Fortner II*), the Court addressed *Advance Business Systems* directly, and held that economic power need not be shown only if there is "the absence of other explanations for the willingness of buyers to purchase the package." *Fortner II,* 429 U.S. at 618 n. 10, 97 S.Ct. at 867 n. 10. The Court noted that "use of the tie-in in this case can be explained as a form of price competition

in the tied product," and that as a result an economic power analysis was necessary. Similarly Beckman argues that its sales were a form of price competition, and other reasons, such as convenience of dealing with the equipment manufacturer, or quality of product, might explain why hospitals or laboratores would buy Beckman reagents. Since other reasons to buy the Beckman reagents are apparent, purchases of a package cannot be condemned without analysis. It is only when no other explanation exists for purchases of the tied product that analysis of market power can be avoided.

■ This follows from the Clayton Act itself, which required that the effect of the tying "may be to substantially lessen competition or tend to create a monopoly." This explicitly requires some analysis of market power to see if competition is, in fact, being lessened or increased. A lessening of competition cannot be presumed from the sale of two products together, unless there is no other reason the tied product would be purchased. Recent cases have recognized these ideas, and rejected any general application of *Advance Business Systems.* See, for example, *Spartan Grain & Mill Co. v. Ayers,* 581 F.2d 419, 428 (5th Cir.1978), *cert. denied* 444 U.S. 831, 100 S.Ct. 59, 62 L.Ed.2d 39 (1979).

The most recent tying case by the Supreme Court, although brought under Section 1 of the Sherman Act, also supports this position. In *Jefferson Parish,* the Court stated that "with respect to the definition of tying, the standards used by the two statutes, the Sherman and Clayton Acts, are the same." *Id.,* 104 S.Ct. at 1564 n. 39. The Court held that where the existence of market power, or leverage, which would "force a purchaser to do something that he would not do in a competitive market" "is probable", then there could be per se condemnation of a tying arrangement. *Id.* at 1559 & 60. Nevertheless, this still requires evidence of market power and actions are not unlawful merely because a "non insubstantial" amount of commerce is affected.

The result is that a Court must inquire into market power, or leverage, before condemning a tying arrangement. This, in turn, requires an analysis of the relevant product market. "In sum, any inquiry into the validity of a tying arrangement must focus on the market or markets in which the two products are sold", quoting from the opinion at 1561.

Decisions do not require that the defendant have a monopoly or even a dominant position throughout the market for the tying product. They do, however, focus attention on the question whether the seller has the power, within the market for the tying product, to raise prices or to require purchasers to accept burdensome terms that could not be exacted in a completely competitive market. In short, the question is whether the seller has some advantage not shared by his competitors in the market for the tying product.

*Fortner II*, 429 U.S. at 620, 97 S.Ct. at 867–68.

The prior analysis of the market for analyzers indicates that Beckman does not have such power. There are many machines that are interchangeable with the Beckman analyzers. If the price of the Beckman machines or of the supporting services for those machines rises too high, then competitive analyzers will be used. While the Beckman machine may be popular, this does not translate into an advantage over competitors that can be used to raise prices or cause acceptance of burdensome terms. No legally valid market can exist, on the undisputed facts, in which Beckman can exercise such economic power.

There is also no evidence of economic power in a market for service contracts, parts, hotline service or other Beckman items, to the extent that those are alleged to be the tying products. The Court would note that for these items, as for the analyzers and reagents, and for similar reasons, the market definitions cannot be confined to merely Beckman products. Therefore, just as the analyzers have insufficient economic power, so too these other items have insufficient leverage in the relevant product markets. At best, the power for these items is the same as that for the analyzers themselves, though in reality, it may be even less. There is evidence of competition from other companies, such as Alpkem, which also supply parts and service for Beckman instruments. In any event, as noted before, the Court also finds no evidence of independent economic power, independent of that for analyzers, for any of these other products such that they might be considered tying products.

Nobel relies primarily on the argument that the existence of patents on parts of the Beckman machine means that Beckman has sufficient economic power. This argument is not valid. Most important, the patents are only on components of the Beckman analyzers and are not on the machines as a whole or on parts that do not have readily available substitutes. There is no dispute, and can be none, that many manufacturers make analyzers that do the identical chemical tests, and can do identical operations. The method may be different, but the result is the same.

For this reason, the cases Nobel cites, which state that patent monopolies give economic power, are not on point. If a patent or copyright is such that it gives the exclusive monopoly over a product, including over related products, then economic power will exist. *Fortner II*, at p. 619, 97 S.Ct. at p. 867. That was the situation in the two cases cited most often to show that a patent or copyright can give economic power. *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948) as to a copyright and *International Salt Co. v. United States*, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947) as to a patent. Absent an exclusive right or a patent covering a whole product, economic power cannot be assumed. Where there are numerous analyzers performing the same functions, the fact that parts of an analyzer may have patent protection is not critical.

What is more important, as demonstrated by cases dealing with market definition, is whether other products are interchange-

able with the item, even despite the patents. *J.T. Gibbons, Inc. v. Crawford Fitting Co.,* 704 F.2d 787, 796 (5th Cir.1983). In *duPont,* for example, cellophane was not a separate market despite the fact that it was patented. The Court finds helpful a recent statement in the *Jefferson Parish* case.

> A common misconception has been that a patent or copyright, a high market share, or a unique product that competitors are not able to offer, suffice to demonstrate market power. While each of these three factors might help to give market power to a seller, it is also possible that a seller in these situations will have no market power; for example, a patent holder has no market power in any relevant sense if there are close substitutes for the patented product. Similarly, a high market share indicates market power only if the market is properly defined to include all reasonable substitutes for the product.

*Jefferson Parish,* 104 S.Ct. at 1572 n. 7, in Justice O'Connor's concurring opinion. In accordance with this, there is no market power in any tying product and Nobel's Clayton Act claims must fail. For the instruments, as well as service and parts, there are readily available substitutes, available from many people. Any attempt to raise price, or impose burdensome conditions, will merely result in customers avoiding Beckman. Without sufficient economic power, there can be no tying.

For all of the above reasons, no tying arrangement exists under either Section 3 of the Clayton Act or Section 1 of the Sherman Act.

Plaintiff also claims that Beckman has engaged in a refusal to deal. In 1979, Nobel placed an order to obtain an ASTRA 8 from Beckman, to be located at Howard University, allegedly so that Nobel could use the machine to test its reagents. The purchase order was refused. A Beckman market specialist stated at deposition that the order was refused because "I didn't want to make it easier for a competitor to compete with us." Deposition of Larry Cohen, at 89. When Howard University then ordered the machine directly in its own name, the purchase order was accepted.

 Nobel argues that this is a violation of Section 1 of the Sherman Act. Section 1 only applies, however, to a "contract, combination or conspiracy," and there is no dispute that the action taken by Beckman was unilateral. Unilateral refusals to deal are legal, as stated in *United States v. Colgate & Co.,* 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919):

> In the absence of any purpose to create or maintain a monopoly, the act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.

See also *Monsanto Co. v. Spray-Rite Service Corp.,* 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). This right to take unilateral action includes the right to refuse to sell to a competitor. See *Pumps and Power Co. v. Southern States Industries, Inc.,* 787 F.2d 1252 (8th Cir.1986). "Absent concerted action, the antitrust laws do not compel a nonmonopolist supplier to furnish a direct competitor with a component part of the finished product as to which the two compete." Therefore, the antitrust laws place no bar on defendant's unilateral conduct.

Nobel stresses that, under the rule in *Colgate,* Beckman's refusal to deal still might be illegal if done with the "purpose to create or maintain a monopoly." *Colgate,* 250 U.S. at 307, 39 S.Ct. at 468. The Court agrees, but the relevant inquiry then becomes whether there has been a violation of Section 2 of the Sherman Act, and not whether there has been a refusal to deal, which requires concerted action. Therefore, the refusal to deal may at best be viewed merely as one fact supporting Nobel's claim of monopolization, or attempted monopolization, by Beckman.

For all of these reasons, the motion of Beckman for summary judgment will be granted, and judgment will be entered in favor of the defendant.

I certify that the foregoing is a correct transcript recorded proceedings in the above-entitled matter.