**INDEPENDENT INK, INC., a California corporation, Plaintiff,**

v.

**TRIDENT, INC., a Connecticut corporation; Illinois Tool Works, Inc.; and Does 1 through 50, Defendants.**

**No. CV98–6686 NM(CWx).**

United States District Court, C.D. California.

June 3, 2002.

---

Jan P Weir, Edward F O'Connor, Stradling Yocca Carlson & Rauth, Newport Beach, CA, Joseph A. Yanny, Kelly W. Cunningham, Yanny & Smith, Los Angeles, CA, Mary L. Grieco, Gursky & Ederer, New York City, for plaintiff.

Martin J Foley, III, Laura A Wytsma, Sonnenschein Nath & Rosenthal, Los Angeles, CA, Willmore F. Holbrow, III, Blakely, Sokoloff, Taylor & Zafman, Los Angeles, CA, Jordan Sigale, G Marc Whitehead, Gary Senner, Sonnenschein Nath & Rosenthal, Chicago, IL, for defendants.

## ORDER

### 1) DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

### 2) GRANTING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

MANELLA, District Judge.

### I. FACTS

Independent Ink, Inc. ("Plaintiff") is a distributor and supplier of printer ink and ink products. Trident, Inc. ("Trident") and Illinois Tool Works, Inc. ("ITW") (collectively, "Defendants") manufacture: 1) a patented piezoelectric ink jet printhead, the first of its type; 2) a patented ink container, consisting of a bottle and a valved cap, that attaches to the printhead; and 3) ink specially formulated for use in Trident's printhead system. Original equipment manufacturers ("OEMs") use Defendants' printhead system to manufacture printers that print bar codes on corrugated materials and kraft paper. These printers are then sold through a network of distributors to end users, usually large product manufacturers, who use the printers to place bar codes on their cartons.

Trident licenses its patented products to OEMs as a package. Trident's license allows OEMs to "manufacturer, use and sell equipment employing and including ink jet printing devices supplied by Trident when used in combination with ink and ink supply systems supplied by Trident...." Plaintiff's Memorandum of Points & Authorities, Ex. 1 (emphasis omitted).[1] Plaintiff alleges that these licenses ("OEM agreements") require OEMs and their customers, end users of printers incorporating Trident's printhead system, to purchase their ink exclusively from Trident. Defendants concede that: 1) OEMs must purchase their ink from Trident; and 2) OEMs and end users may not re-fill Trident ink containers with *any* ink, as they are intended as single-use containers. Defendants' Supplemental Brief, March 22, 2002, at 2. Trident's internal memoranda, proffered by Plaintiff, confirm that OEMs must purchase their ink from Trident and that neither OEMs nor end users may re-fill Trident's ink cartridges. *See, e.g.*, Plaintiff's Supplemental Brief, March 28, 2002, Ex. E; Plaintiff's Memorandum of Points & Authorities, Exs. 1–2. However, Defendants contend that the OEM agreements do not prevent end users from purchasing ink and ink containers from third-party ink manufacturers, like Plaintiff. *See* O'Connor Decl., February 11, 2002, Ex. 35. Various manufacturers offer ink for use in Trident's printhead system, including Graphic Controls, Squid Ink. Renewable Resources, and ATG. *See, e.g.*, Wystma Decl., Ex. C (Admission No. 26); Brucker Depo., July 24, 2000, at 145–46; Brucker Depo., July 25, 2000, at 97; O'Connor Decl., February 11, 2002, Exs. 5, 6, 36; Defendants' Statement of Uncontroverted Facts, No-

---

1. Plaintiff's exhibits attached to the following briefs are not properly authenticated, as they are not accompanied by sworn declarations: 1) Plaintiff's Memorandum of Points & Authorities in Support of its Motion for Summary Judgment, October 3, 2001; and 2) Plaintiff's Supplemental Brief, March 28, 2002. *See Orr v. Bank of Am.*, 285 F.3d 764, 773–74 (9th Cir.2002). However, as Defendants do not challenge their authenticity, the court will consider them.

vember 13, 2001, at ¶ 15. Although Plaintiff asserts that Trident does not warranty its printhead system for use with third-party inks, Plaintiff does not dispute "the existence of competitors such as Squid Ink, ATG, and Graphic Controls, which, among other competitors in the ink jet ink market, offer ink for use in printing systems incorporating Trident's printhead." Defendants' Statement of Uncontroverted Facts, November 13, 2001, at ¶ 15.

Trident is not the only competitor who manufactures systems for affixing bar codes to cartons. At least two other companies, Markem and Xaar, have developed printheads capable of printing bar codes on corrugated materials and kraft paper. Wystma Decl., Ex. C (Admission No. 31); Wystma Decl., Ex. F, Brucker Depo. at 120–21; Defendants' Statement of Uncontroverted Facts, November 13, 2001, at ¶ 16.[2] Product manufacturers also use labeling systems to print bar-coded labels, which are then affixed to cartons. Wystma Decl., Ex. F, Brucker Depo. at 191, 205, 207; Defendants' Statement of Uncontroverted Facts, November 13, 2001, at ¶ 21. Plaintiff does not dispute testimony that these labeling systems compete with Trident's printhead systems. Pullen Depo. at 101; Wystma Decl., Ex. H, Barnett Depo. at 119.

On August 14, 1998, Plaintiff filed an action seeking a declaratory judgment that it did not infringe upon two of Defendants' patents, and Trident subsequently filed a patent infringement action against Plaintiff.[3] Plaintiff amended its complaint to allege that Defendants orchestrated unlawful tying arrangements in violation of the Sherman Act, 15 U.S.C. § 1 *et seq.*, and Section 16727 of the Cartwright Act, California Business & Professional Code § 16700 *et seq.* Plaintiff alleges that Defendants conditioned the sale of their patented printhead systems ("the tying product") upon OEMs' also purchasing and distributing Trident's ink ("the tied product").[4] Plaintiff alleges that these tying arrangements preclude OEMs and end users from purchasing printer ink from third parties, like Plaintiff, restraining trade, in violation of Section 1 of the Sherman Act. Fourth Amended Complaint ¶¶ 20–27. Plaintiff also alleges that Defendants monopolized, attempted to monopolize, and conspired to monopolize the market for ink used in Trident's printhead system, in violation of Section 2 of the Sherman Act. *Id.* ¶¶ 21, 26.

Both parties move for summary judgment of Plaintiff's Section 1 claim, and Defendants move for summary judgment of Plaintiff's Section 2 claim. With respect to its Section 1 claim, Plaintiff argues that Defendants necessarily have market power in the market for the tying product as a matter of law solely by virtue of the patent on their printhead system, thereby rendering Defendants' tying arrangements *per se* violations of the antitrust laws. Plaintiff contends "[a]s a matter of law, one cannot use contracts which contain patent licenses and make the patent licenses conditioned upon the sale of products which are not patented." Plaintiff's Memorandum of Points & Authorities at 14. However, Plaintiff concedes that "the mere fact of having a patent does not create market

---

**2.** Plaintiff does not dispute that "competitors, such a Markem and Xaar, offer printers which, like the Trident printhead, are capable of printing barcodes on corrugated materials and kraft paper." Defendants' Statement of Uncontroverted Facts, November 13, 2001, at ¶ 16.

**3.** Plaintiff added ITW as a party to this action after ITW acquired Trident.

**4.** Plaintiff's motion does not address how Trident's ink containers relate to its tying claim. Trident has maintained throughout this litigation that the container and the ink constitute one product.

power *vis-a-vis* the products with which the patented product competes." Plaintiff's Reply Brief at 4. Plaintiff does not dispute that its sales have increased during the period Trident allegedly violated the antitrust laws. Defendants' Statement of Uncontroverted Facts, November 13, 2001, at ¶ 32. Thus, the issue before this court concerning Plaintiff's claim under Section 1 of the Sherman Act is narrowly focused upon whether a patent confers market power in the market for the tying product as a matter of law.

Plaintiff's motion and opposition to Defendants' motion do not discuss the products at issue, their substitutes, or the relevant markets. Plaintiff's expert witness "did not perform an antitrust analysis at all." Plaintiff's Response to Defendants' Statement of Uncontroverted Facts, December 4, 2001, at ¶ 10. Plaintiff's motion cites little authority in support of its argument and identifies no tying case in which a court granted the plaintiff summary judgment solely by virtue of the fact that the defendant held a patent on the tying product. Plaintiff's Statement of Uncontroverted Facts in support of its motion contains only one fact: "[Defendants'] OEM agreements contain a patent license on their patented printhead technology. A precondition to this license is that Trident's OEMs as well as their customers (i.e. end users) purchase all of their consumable products (ink) from [Defendants], whether or not those consumables are patented." Plaintiff's Statement of Uncontroverted Facts, October 3, 2001, at ¶ 1. Plaintiff's Statement contains only one conclusion of Law: "Patent tying contracts

are a *per se* violation of the antitrust laws." *Id.* ¶ 1. Plaintiff does not argue that Defendants' tying arrangements violate the Sherman Act pursuant to the Rule of Reason.[5] Nor does Plaintiff's motion or opposition to Defendants' motion address its claims that Defendants monopolized, attempted to monopolize, and conspired to monopolize the market for ink in violation of Section 2 of the Sherman Act.[6]

With respect to the Section 1 claim, Defendants argue that Plaintiff cannot establish that Defendants had market power in the tying product market, a requisite element of a tying case. Defendants dispute Plaintiff's contention that a patent, standing alone, with no consideration of the products at issue, their substitutes, or the relevant markets, establishes market power in a tying case as a matter of law. Defendants also argue that Plaintiff cannot establish market power through any other means, as Plaintiff: 1) developed no evidence with which to define the relevant product market; 2) developed no evidence with which to define the relevant geographic market; 3) proffers no credible evidence that Defendants have market power in the relevant market; and 4) identifies no legitimate barriers to entry.

Defendants also argue that Plaintiff cannot, as a matter of law, raise a triable issue of fact that Defendants violated Section 2 of the Sherman Act with respect to either the printhead market or the ink market. Defendants argue that Plaintiff cannot maintain a Section 2 claim with respect to the market for the patented printhead system for the same reasons it cannot prevail

---

**5.** Tying arrangements may be unlawful *per se* or pursuant to the Rule of Reason. *See County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1157 (9th Cir.2001) (citations omitted). "[T]he inquiry mandated by the Rule of Reason is whether the challenged agreement is one that promotes competition or one that suppresses competition." *Nation-*

*al Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 691, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978).

**6.** The court ordered additional briefing from both parties February 1 and March 15, 2002 on whether Defendants violated Section 2 of the Sherman Act.

on its Section 1 claim. Defendants argue that Plaintiff cannot establish that Defendants monopolized, attempted to monopolize, or conspired to monopolize the ink market, as Plaintiff: 1) developed no evidence with which to define the relevant product market; 2) developed no evidence with which to define the relevant geographic market; and 3) proffers no credible evidence that Defendants possess monopoly power in the relevant market or ever had a "dangerous probability of success" in achieving monopoly power.

## II. LEGAL STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment is "properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corporation v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (quoting Fed. R.Civ.P. 1). Determinations of credibility, however, should be left to the trier of fact. *See Hanon v. Dataproducts Corp.*, 976 F.2d 497, 507 (9th Cir.1992). Accordingly, issues that turn on such determinations should not be resolved at the summary judgment stage. *See id. See also Palacios v. City of Oakland*, 970 F.Supp. 732, 738 (N.D.Ca.1997) ("In judging evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence[.]")

In a trio of 1986 cases, the Supreme Court clarified the applicable standards for summary judgment. *See Celotex, supra; Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986);

*Matsushita Electric Industry Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Anderson*, 477 U.S. at 256, 106 S.Ct. at 2514. The governing substantive law dictates whether a fact is material; if the fact may affect the outcome, it is material. *See id.* at 248, 106 S.Ct. at 2510. If the moving party seeks summary judgment with respect to a claim or defense upon which it bears the burden of proof at trial, it must satisfy its burden with affirmative, admissible evidence. By contrast, when the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out the absence of evidence submitted by the non-moving party. The moving party need not disprove the other party's case. *See Celotex*, 477 U.S. at 325, 106 S.Ct. at 2554.

If the moving party meets its initial burden, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). When assessing whether the non-moving party has raised a genuine issue, the court must believe the evidence and draw all justifiable inferences in the non-movant's favor. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970)). Nonetheless, "the mere existence of a scintilla of evidence" is insufficient to create a genuine issue of material fact. *Id.* at 252, 106 S.Ct. at 2512. As the Supreme Court explained in *Matsushita*,

[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that

there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial."

*Id.*, 475 U.S. at 586–87, 106 S.Ct. at 1356 (citations omitted).

 To be admissible for purposes of summary judgment, declarations or affidavits must be based on personal knowledge, must set forth "such facts as would be admissible in evidence," and must show that the declarant or affiant is competent to testify concerning the facts at issue. Fed.R.Civ.P. 56(e). Declarations on information and belief are insufficient to establish a factual dispute for purposes of summary judgment. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir.1989).

### III. PLAINTIFF'S SECTION ONE CLAIM—DEFENDANTS' TYING ARRANGEMENTS

 "A tying arrangement exists when a seller refuses to sell one product, 'the tying product,' unless the buyer also purchases a second product, 'the tied product.'" Christopher R. Leslie, *Unilaterally Imposed Tying Arrangements and Antitrust's Concerted Action Requirement,* 60 Ohio St.L.J. 1773, 1773 (1999). In order to establish that a tying arrangement violates Section 1 of the Sherman Act, a plaintiff must establish: 1) two distinct products or services; 2) a sale or agreement to sell the tying product conditioned upon the purchase of the tied product; 3) market power in the relevant market for the tying product; and 4) the tied product involves a "not insubstantial" amount of interstate commerce.[7] *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12–18, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984). *See also Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 464, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992); *United States v. Microsoft Corp.*, 253 F.3d 34, 85 (D.C.Cir. 2001); *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1157 (9th Cir.2001). The Ninth Circuit also requires that the defendant have an economic inter-

---

**7.** Defendants argue that Plaintiff's motion does not adequately address several requisite elements. Plaintiff merely asserts in its reply brief that two distinct products exist in this case because one is a printhead and the other is ink for use with that technology. The issue whether two products are distinct "turns not on the functional relation between them, but rather on the character of the demand for the two items." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 19, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984). A tying arrangement is not unlawful unless there is sufficient demand for the tied product separate from that of the tying product so as to denote two separate markets. *Id. See also Allen–Myland, Inc. v. International Bus. Machs. Corp.*, 33 F.3d 194, 211–12 (3d Cir.1994); *Service & Training, Inc. v. Data Gen. Corp.*, 963 F.2d 680, 684 (4th Cir.1992) (Luttig, J.). As Defendants note, Plaintiff also fails to address sufficiently whether Defendants' sales of printer ink, the tied product, involved a "not insubstantial" amount of interstate commerce. *See Jefferson Parish*, 466 U.S. at 8, 104 S.Ct. 1551 (citing *Northern Pacific Ry. Co. v. United States*, 356 U.S. 1, 11, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958)). As the antitrust laws are intended to protect competition rather than individual competitors, a tying arrangement violates Section 1 of the Sherman Act only if it "affects a substantial volume of commerce in the tied market." *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 461–62, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (*Fortner Enters., Inc. v. United States Steel Corp.*, 394 U.S. 495, 503, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969) ("*Fortner I*")); *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). "[T]he controlling consideration is simply whether a total amount of business, substantial enough in terms of dollar-volume so as not to be merely *de minimis*, is foreclosed to competitors by the tie...." *Datagate, Inc. v. Hewlett–Packard Co.*, 60 F.3d 1421, 1425 (9th Cir. 1995) (quoting *Fortner I*, 394 U.S. at 501, 89 S.Ct. 1252). Regardless, both parties seem to agree that market power will be the dispositive element in this case.

est in the tied product. *See County of Tuolumne,* 236 F.3d at 1158. "[I]f the tying entity receives no economic benefit from the tie, then we can safely presume that it is not attempting to spread its power into the tied-product market, and we need not strike the arrangements down as an illegal tie under the antitrust laws." *Id.* (citing *Gonzalez v. St. Margaret's House Hous., Dev. Fund Corp.,* 880 F.2d 1514, 1517 (2d Cir.1989)).

Market power is the power "to force a purchaser to do something that he would not do in a competitive market," *viz.,* purchase a tied product that he either did not want or may have preferred to purchase elsewhere on different terms. *Eastman Kodak,* 504 U.S. at 464, 112 S.Ct. 2072 (quoting *Jefferson Parish,* 466 U.S. at 14, 104 S.Ct. 1551). Tying arrangements are not unlawful, absent market power in the market for the tying product. *See, e.g., Jefferson Parish,* 466 U.S. at 34–35, 104 S.Ct. 1551 (O'Connor, concurring) ("The Court has never been willing to say of tying arrangements, as it has of price-fixing, division of markets and other agreements subject to *per se* analysis, that they are always illegal, without proof of market power or anticompetitive effect."). Plaintiff proffers no direct evidence that Defendants have market power, such as proof that Defendants restrict their output and charge supracompetitive prices. *See Rebel Oil Co., Inc. v. Atlantic Richfield Co.,* 51 F.3d 1421, 1434 (9th Cir.1995).

### A. Defendants' Patent Alone Does Not Confer Market Power

■ Plaintiff argues that a patent, standing alone, with no consideration of the products at issue, their substitutes, or a definition of the relevant market, establishes market power in a tying case as a matter of law. The weight of authority is to the contrary. *See, e.g., id.,* 466 U.S. at 37 n. 7, 104 S.Ct. 1551 (O'Connor, J., concurring) ("A common misconception has

been that a patent . . . suffice[s] to demonstrate market power. . . . [A] patent holder has no market power in any relevant sense if there are close substitutes for the patented product."); *Northern Pacific Ry. Co. v. United States,* 356 U.S. 1, 10 n. 8, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958) ("Of course it is common knowledge that a patent does not always confer market power over a particular commodity. Often the patent is limited to a unique form or improvement of the product and the economic power resulting from the patent privileges is slight."); *In re Independent Service Orgs. Antitrust Litig.,* 203 F.3d 1322, 1325–26 (Fed.Cir.2000) ("A patent alone does not demonstrate market power."); *Virginia Panel Corp. v. MAC Panel Co.,* 133 F.3d 860, 872 (Fed.Cir.1997) ("Violation of the antitrust laws always requires . . . market power in a defined relevant market (which may be broader than that defined by the patent). . . ."); *A.I. Root Co. v. Computer Dynamics, Inc.,* 806 F.2d 673, 675 (6th Cir.1986) ("[W]e reject any absolute presumption of market power for copyrighted or patented products. . . ."); *Will v. Comprehensive Accounting Corp.,* 776 F.2d 665, 673 n. 4 (7th Cir.1985) (Easterbrook, J.); *USM Corp. v. SPS Techs., Inc.,* 694 F.2d 505, 511 (7th Cir.1982) (Posner, J.) ("[O]f course, not every patent confers market power. . . ."); *Northlake Mktg. & Supply, Inc. v. Glaverbel S.A.,* 861 F.Supp. 653, 662 (N.D.Ill.1994) ("A common misconception has been that a patent . . . suffices to demonstrate market power."); PHILLIP E. AREEDA, ET AL., ANTITRUST LAW ¶ 1737a (1996) (legal monopoly protected by a patent "is not necessarily or even typically a market monopoly.").

Courts in the Ninth Circuit also reject the idea that a patent or copyright confers market power as a matter of law. *See Digidyne Corp. v. Data Gen. Corp.,* 734 F.2d 1336, 1342–44 (9th Cir.1984) (copyright creates only a "presumption of eco-

nomic power"). *See also Mozart Co. v. Mercedes–Benz of North Am., Inc.,* 833 F.2d 1342, 1346 (9th Cir.1987) (citing *Digidyne, supra*); *Schlafly v. Public Key Partners,* No. 94–20512 SW, 1997 WL 564073, at *4 (N.D.Cal. Aug.29, 1997) ("A patent does not of itself establish a presumption of market power in the antitrust sense.") (citations omitted), *aff'd,* 155 F.3d 565 (Fed.Cir.1998) ("Mere possession of a patent, or a family of patents, does not establish a presumption of antitrust market power."); *In re Data Gen. Corp. Antitrust Litig.,* 490 F.Supp. 1089, 1112–13 (N.D.Cal. 1980) ("The Ninth Circuit has also indicated that the existence of a patent ... does not *ipso facto* establish the requisite economic power.") (citing *Rex Chainbelt, Inc. v. Harco Products, Inc.,* 512 F.2d 993, 1002 (9th Cir.1975)).[8]

Plaintiff attempts to distinguish the instant case by arguing that "patent tying cases" are treated differently than "regular antitrust cases," referring, presumably, to tying cases not involving patents. *See, e.g.,* Plaintiff's Reply Brief at 4. However, Plaintiff cites no case recognizing this distinction. Moreover, courts have rejected the notion that a patent automatically confers market power to its holder in "patent tying cases." *See, e.g., Schlafly,* 1997 WL 564073, at *3–4 (Williams, J.) (no presumption of market power where defendant allegedly tied software products to public key cryptology patent licenses), *aff'd,* 155 F.3d 565 (Fed.Cir.1998); *F.B. Leopold Co., Inc. v. Roberts Filter Mfg. Co., Inc.,* 882 F.Supp. 433, 454 (W.D.Pa. 1995) (Ambrose, J.) (patent on porous

plate, the tying product, insufficient to establish market power), *aff'd,* 119 F.3d 15 (Fed.Cir.1997); *Chiuminatta Concrete Concepts, Inc. v. Target Products, Inc.,* No. CV 92–1523 LGB (Sx), 1992 WL 465720, at *4 (C.D.Cal. Dec. 2, 1992) (Baird, J.) (patent on certain skid plates, the tying products, insufficient to establish market power in tying claim), *aff'd,* 19 F.3d 41 (Fed.Cir.1994).

The U.S. Department of Justice and Federal Trade Commission reject the notion that a presumption of market power arises from a patent in "patent tying cases." "The agencies will not presume that a patent, copyright, or trade secret necessarily confers market power upon its owner." Department of Justice and the Federal Trade Commission, Antitrust Guidelines for the Licensing of Intellectual Property, Section 5.3., Tying Arrangements, April 6, 1995, at *http://www.usdoj. gov/atr/public/guidelines/ ipguide.htm* (Last modified Sept. 14, 2001).

Plaintiff cites oft-quoted language from *Jefferson Parish:* "[I]f the Government has granted the seller a patent or similar monopoly over a product, it is fair to *presume* that the inability to buy the product elsewhere gives the seller market power." *Jefferson Parish,* 466 U.S. at 11, 104 S.Ct. 1551 (emphasis added). However, the quoted language is of limited benefit to Plaintiff, as *Jefferson Parish* was not a "patent tying case." *See* PHILLIP E. AREEDA, ET AL., ANTITRUST LAW ¶ 1737c (1996) ("When none of the justices says that a patent itself indicates market power, the

---

**8.** *Grid Sys. Corp. v. Texas Instruments, Inc.,* 771 F.Supp. 1033, 1037 (N.D.Cal.1991) did not hold to the contrary. That case involved the Patent Misuse Reform Act of 1988 and, in a footnote, quoted an article written by a practitioner in Des Moines, Iowa opining that "the presumption of economic power, when the tying product is a patent or copyright, survives." *Id.* at 1037 n. 2 (citing Richard

Calkins, *Patent Law: The Impact of the 1988 Patent Misuse Reform Act and Noerr–Pennington Doctrine on Misuse Defenses and Antitrust Counterclaims,* 38 DRAKE L.REV. 175, 196 (1989)). However, the court cited this article for the proposition that the Patent Misuse Reform Act does not amend the Sherman Act rather than as part of a holding that a patent confers market power.

presumption of power noted in some dicta must rest on either precedent or administrative convenience, although neither explanation persuades."). In fact, elsewhere in its opinion, the Court in *Jefferson Parish* implicitly rejected the idea that a patent necessarily confers market power. "In sum, any inquiry into the validity of a tying arrangement must focus on the market or markets in which the two products are sold, for that is where the anticompetitive forcing has its impact." *Jefferson Parish,* 466 U.S. at 18, 104 S.Ct. 1551.[9]

Moreover, the Court's decisions both before and after *Jefferson Parish* do not support Plaintiff's argument. Prior to deciding *Jefferson Parish,* the Court declined to hold that a patent establishes market power as a matter of law. *See, e.g., Northern Pacific Ry.,* 356 U.S. at 10 n. 8, 78 S.Ct. 514 ("Of course it is common knowledge that a patent does not always confer market power over a particular commodity."). After deciding *Jefferson Parish,* the Court again rejected the notion that market power may be determined in the abstract. "Legal presumptions that rest on

formalistic distinctions rather than actual market realities are generally disfavored in antitrust law.' This Court has preferred to resolve antitrust claims on a case-by-case basis, focusing on the 'particular facts disclosed by the record.' [citations omitted]. In determining the existence of market power ... this Court has examined closely the economic reality of the market at issue." *Eastman Kodak,* 504 U.S. at 466–67, 112 S.Ct. 2072 (citations omitted). Indeed, Plaintiff does not identify a single tying case in which a court has granted the plaintiff summary judgment solely by virtue of the fact that the defendant held a patent on the tying product. Plaintiff also fails to distinguish the volume of precedent and controlling authority rejecting this proposition.[10]

Additionally, Plaintiff cites no facts that would allow this court to draw an inference of market power based upon Defendants' patent. Any presumption of market power must be based upon a discussion of the products at issue, their substitutes, and the relevant markets, which Plaintiff does not provide. *See, e.g., id.* Plaintiff pro-

---

9. In her oft-quoted concurrence, Justice O'Connor recognized that "[a] common misconception has been that a patent ... suffice[s] to demonstrate market power ... [because] a patent holder has no market power in any relevant sense if there are close substitutes for the patented product." She was joined by Chief Justice Burger, Justice Powell, and Justice Rehnquist. *Jefferson Parish,* 466 U.S. at 37 n. 7, 104 S.Ct. 1551 (O'Connor, J., concurring). Less than a year later, Justice White, joined by Justice Blackmun, stated that "a particular tying arrangement may have procompetitive justifications, and it is thus inappropriate to condemn such an arrangement without considerable market analysis." *Data General Corp. v. Digidyne Corp.,* 473 U.S. 908, 908, 105 S.Ct. 3534, 87 L.Ed.2d 657 (1985) (order denying writ of certiorari) (White, J., dissenting) (citations omitted). The fact that six of the justices who decided *Jefferson Parish* would reject the notion that a patent confers market power as a matter of

law supports the court's conclusion that Plaintiff's reliance upon *Jefferson Parish* is misplaced.

10. Plaintiff cites several vintage Supreme Court cases in support of its argument, including *United States Steel Corp. v. Fortner Enters.,* 429 U.S. 610, 97 S.Ct. 861, 51 L.Ed.2d 80 (1977) ("*Fortner II*"); *White Motor Co. v. United States,* 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963); *United States v. Loew's, Inc.,* 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962); *International Salt Co. v. United States,* 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947). The Court's language concerning presumptions of market power based upon patents arose at a time when genuine proof of power in the market for the tying product was not required. *See* PHILLIP E. AREEDA, ET AL., ANTITRUST LAW ¶ 1737a (1996). However, in *Jefferson Parish,* the Court began demanding real proof of such market power. *See id.*

vides no background on the tying product, "printhead systems," or the tied product, "ink." Plaintiff does not discuss consumer demand for Defendants' printhead system and cites no evidence it is sufficiently unique to warrant a presumption of market power. *See United States Steel Corp. v. Fortner Enterprises, Inc.*, 429 U.S. 610, 620–22, 97 S.Ct. 861, 51 L.Ed.2d 80 (1977) ("*Fortner II*") ("Uniqueness confers economic power only when other competitors are in some way prevented from offering the distinctive product themselves.") (citations omitted). Plaintiff does not discuss whether Defendants' patent acts as a barrier to entry by precluding competitors from marketing the same product as Trident. In fact, Plaintiff admits that at least two other competitors, Markem and Xaar, have offered printheads that are capable of printing bar codes on corrugated materials and kraft paper. Wystma Decl., Ex. C (Admission No. 31); Wystma Decl., Ex. F, Brucker Depo. at 120–21; Defendants' Statement of Uncontroverted Facts, November 13, 2001, at ¶ 16.

Nor does Plaintiff discuss potential substitutes that existed before Markem and Xaar entered the market. Indeed, Plaintiff concedes that manufacturers can and have used labels to place bar codes on their products. Wystma Decl., Ex. F, Brucker Depo. at 191, 205, 207; Defendants' Statement of Uncontroverted Facts, November 13, 2001, at ¶ 21. Plaintiff does not argue that these labeling systems are not suitable substitutes for Defendants'

printhead system. Plaintiff does not dispute testimony that Trident's printheads compete with labeling systems. Pullen Depo. at 101; Wystma Decl., Ex. H, Barnett Depo. at 119. Plaintiff does not dispute testimony that Thomas Barnett, president of an OEM selling both labeling systems and Trident printers, had to convince his customers to use printers instead of labeling systems, and lost some of his business to competitors who sold labels. Wystma Decl., Ex. H, Barnett Depo. at 119. Plaintiff does not dispute testimony that labeling systems may even have advantages over printers in terms of quality and reliability. *Id.*

Plaintiff's only discussion of the products at issue, their substitutes, and the relevant markets is cursory, at best, and contains few, if any, citations to the factual record. In essence, Plaintiff requests this court to presume that a patent on a particular type of "widget" demonstrates market power without providing any discussion of "widgets," their substitutes, or the market in which they compete. The court cannot presume market power in the abstract. Without some discussion of the particular facts of this case, this court cannot presume that Defendants' patent prevents OEMs from purchasing other printhead systems or potential substitutes, such as labeling systems.[11]

■ Even were this court to draw an inference of market power based upon Defendants' patent, any such presumption

---

**11.** Defendants argue that Congress likely abrogated any presumption in tying cases that a patent confers market power upon its holder. Four years after the Supreme Court decided *Jefferson Parish*, Congress passed the Patent Misuse Reform Act of 1988, which provides that a tying arrangement does not constitute patent misuse in the absence of market power. 35 U.S.C. § 271(d)(5). If, as is clear, a patent is insufficient to establish market power in tying cases when considering the "patent misuse defense," it would be anomalous

for the same patent to be sufficient to establish market power in the same case for purposes of a counterclaim under the Sherman Act. *See* PHILLIP E. AREEDA, ET AL., ANTITRUST LAW ¶ 1737c (1996) ("[T]he Patent Act amendment effectively abolishes any presumption of market power for patents or patented tying products in antitrust suits as well as in patent misuse doctrine."). The court need not resolve this issue for purposes of deciding the instant motions.

would be inconclusive and rebuttable. *See Jefferson Parish*, 466 U.S. at 11, 104 S.Ct. 1551 ("[I]f the Government has granted the seller a patent or similar monopoly over a product, it is fair to *presume* that the inability to buy the product elsewhere gives the seller market power.") (emphasis added); *United States v. Loew's, Inc.*, 371 U.S. 38, 45–46, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962) ("The requisite economic power is *presumed* when the tying product is patented or copyrighted.") (emphasis added); *Digidyne*, 734 F.2d at 1344 (any presumption of market power based upon copyright would be rebuttable). The undisputed facts in this case rebut any presumption that Defendants' patent gives them market power. It is undisputed that consumers could place bar-coded labels on their products before other competitors manufactured bar-coding printers, and Plaintiff does not establish that the various labeling systems are not proper substitutes for Defendants' printhead system or dispute Defendants' argument that they are. Moreover, while Trident has a patent on its printhead system, at least two other competitors, Markem and Xaar, have designed printheads that can print bar codes on kraft paper. The fact that Markem and Xaar have done so indicates that any barriers to entry, such as R & D and manufacturing costs, are not so great as to prevent competitors from entering the market.[12]

These undisputed facts would rebut any presumption, if available, that Defendants hold market power by virtue of their patent. As Plaintiff relies upon nothing more than Defendants' patent, it cannot establish that Defendants had market power in the market for the tying product, an omission fatal to its claim that Defendants'

tying arrangements are *per se* violations of the Sherman Act. Moreover, Plaintiff does not argue that Defendants' tying arrangements violate the Sherman Act pursuant to the Rule of Reason. Accordingly, Plaintiff's motion for summary judgment on its claim under Section 1 of the Sherman Act is **DENIED**.[13]

### B. Plaintiff Does Not Show Market Power Through Defendants' Market Share

 Defendants move for summary judgment on Plaintiff's Section 1 claim, arguing that Plaintiff neither proffers direct evidence that Defendants have market power nor establishes that Defendants have market power by virtue of their market share. The existence of market power may be inferred from the seller's possession of a predominant share of the market. *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 17, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984); *United States v. Grinnell Corp.*, 384 U.S. 563, 571, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *Times–Picayune Publishing Co. v. U.S.*, 345 U.S. 594, 611–13, 73 S.Ct. 872, 97 L.Ed. 1277 (1953). In order to demonstrate market power circumstantially, Plaintiff must: 1) define the relevant product and geographic markets; 2) show that Defendants possess a dominant share of those markets; and 3) show that there are significant barriers to entry and that existing competitors lack the capacity to increase their output in the short run. *See Rebel Oil*, 51 F.3d at 1434.

### 1. Plaintiff Fails To Define the Product Market for the Tying Product

Plaintiff proffers no evidence concerning the relevant product market, a prerequi-

---

**12.** Plaintiff cites unauthenticated anecdotal evidence that some of Trident's customers were dissatisfied with having to buy Trident's ink. However, Trident's customers' opinions of the tying arrangements are insufficient to establish that Trident had market power.

**13.** Plaintiff's claims under the Cartwright Act are predicated upon the same facts as its claims under Section 1 and Section 2 of the Sherman Act. Plaintiff does not address these claims independently of its Sherman Act claims.

site to establishing that Defendants have market power by virtue of their market share. *See Jefferson Parish*, 466 U.S. at 26, 104 S.Ct. at 1566–67. *See also Brown Shoe Co. v. United States*, 370 U.S. 294, 325–28, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 513 (3d Cir.1998) (Becker, C.J.). "Market definition is crucial. Without a definition of the relevant market, it is impossible to determine market share." *Rebel Oil*, 51 F.3d at 1434. *See also Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177–78, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965) ("Without a definition of [the] market, there is no way to measure [Defendants'] ability to lessen or destroy competition"). Market definition is frequently dispositive in antitrust litigation. *See, e.g., AD/SAT v. Associated Press*, 181 F.3d 216, 225 (2d Cir.1999).[14]

■ A product market includes the product at issue and its substitutes. In order to define a product market, a party must determine cross-elasticity of demand, or which products are reasonably interchangeable with the product at issue from the perspective of consumers. *See Brown Shoe*, 370 U.S. at 325, 82 S.Ct. 1502. *See also Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 218 (D.C.Cir.1986) (Bork, J.); *Hornsby Oil Co., Inc. v. Champion Spark Plug Co., Inc.*, 714 F.2d 1384, 1393 (5th Cir.1983). Products need not be identical to be part of the same market. *United States v. Continental Can Co.*, 378 U.S. 441, 449–50, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964). "If consumers view the products as substitutes, the products are part of the same market." *Rebel Oil*, 51 F.3d at 1435. Whether products are substitutes for the

product at issue will depend upon their prices, uses, and qualities. *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). Defining a product market also entails consideration of potential competitors who may enter the market, *viz.*, cross-elasticity of supply. *See Brown Shoe*, 370 U.S. at 325, 82 S.Ct. 1502. "[M]arket definition must look at all relevant sources of supply, either actual rivals or eager potential entrants to the market." *Kaplan v. Burroughs Corp.*, 611 F.2d 286, 292 (9th Cir.1979) (citations omitted).

Plaintiff proffers no evidence concerning the relevant product market in its motion, its opposition to Defendants' motion, or its supplemental briefs, which is fatal to its Section 1 claim. Plaintiff cannot establish that Defendants have a predominant share of "the market" without defining the relevant product market. Defendants may have a large market share if the tying product market is defined as "piezoelectric ink jet printhead systems that use high-quality ink to print bar codes on kraft paper." Conversely, Defendants would have a smaller market share if the tying product market was comprised of any product that could be used to place a bar code on a retail product, such as labeling machines that print bar-coded labels, which consumers indisputably use for such a purpose. Defendants' market share would also be smaller if the tying product market were defined as "patented printing systems." Moreover, Defendants' alleged market power would be further diminished if numerous potential competitors were poised to enter the market.

■ Plaintiff argues that market definition is irrelevant in a "patent tying case."

14. Plaintiff's complaint asserts that the relevant markets are "commercial ink jet inks, patented containers for said commercial ink jet inks and patented printing systems in which said commercial ink jet inks are used." Fourth Amended Complaint ¶ 19. Plaintiff proffers no evidence or argument in support of this assertion.

In Plaintiff's view, "What do cross-elasticity of demand or cross-elasticity of supply have to do with a patent tying case?" Plaintiff's Opposition Brief at 1.[15] At oral argument, Plaintiff's counsel argued that the patent itself defines the relevant market in tying cases. However, a patent does not necessarily define a product market. *See, e.g., Virginia Panel Corp. v. MAC Panel Co.,* 133 F.3d 860, 872 (Fed. Cir.1997) ("[V]iolation of the antitrust laws always requires ... market power in a defined market (which may be broader than that defined by the patent)....").

Plaintiff also briefly argues that the relevant product market is not the entire market for printhead systems, but is defined exclusively by Trident's patented printhead system. Plaintiff argues that Defendants have market power "in their particular type of system." Plaintiff's Opposition Brief at 3. This may be true. However, all manufacturers have a "natural monopoly" over their own brand of product. *See, e.g., Nobel Scientific Indus., Inc. v. Beckman Instruments, Inc.,* 670 F.Supp. 1313, 1323 (D.Md.1986), *aff'd,* 831 F.2d 537 (4th Cir.1987) ("The 'natural monopoly' of a manufacturer in his own products is not an antitrust violation."). The pertinent issue is whether Defendants have market power in a market that includes: 1) both their "particular type of system" *and* all reasonable substitutes, as judged from the perspective of the consumer; and 2) all relevant sources of supply from actual competitors and potential entrants to the market.

Plaintiff cites no evidence or authority in support of its argument that the product market includes only Trident's patented printhead system. Plaintiff does not discuss or analyze the range of competing substitutes for Defendants' printhead system, a prerequisite to market definition. Nor does Plaintiff consider potential competitors who could enter the relevant market. Plaintiff argues only that because it makes ink specifically for Defendants' printhead systems, the market—from Plaintiff's perspective—is limited exclusively to Defendants' product. However, Plaintiff's perspective is not relevant in defining the product market. *See, e.g., Brown Shoe,* 370 U.S. at 325, 82 S.Ct. 1502; *Continental Can Co.,* 378 U.S. at 449–50, 84 S.Ct. 1738; *E.I. du Pont de Nemours,* 351 U.S. at 395, 76 S.Ct. 994; *Rebel Oil,* 51 F.3d at 1435; *Rothery Storage,* 792 F.2d at 218; *Hornsby Oil,* 714 F.2d at 1393; *Kaplan,* 611 F.2d at 292. The critical issue in a Section 1 tying case is whether consumers are being forced to buy the tied product by virtue of a defendant's market power in the market for the tying product. Accordingly, the relevant consideration is whether substitutes are available to consumers of Defendants' product. *See, e.g., Kaplan,* 611 F.2d at 292 ("In defining the relevant market, the court must look beyond the particular commodity produced by an alleged monopolist because the relevant product market for determining monopoly power, or the threat of monopoly control, depends upon the availability of alternative commodities for buyers."); *Columbia Metal Culvert v. Kaiser Aluminum & Chem. Corp.,* 579 F.2d 20, 30 (3d Cir.1978) ("[I]t is not the perceptions of manufacturers but those of consumers which are most salient in the determination of market boundaries."). The

15. Undertaking no analysis, Plaintiff asserts that "[b]ecause Trident held patents, no one else could make that system. Accordingly, there was zero elasticity of supply in the relevant (tying product) market during the relevant time period." Plaintiff's Supplemental Brief, March 28, 2002, at 5. However, Plaintiff's bald assertion does not account for other printheads that can print bar codes on corrugated materials and kraft paper, as well as close substitutes, such as labeling machines.

mere fact that Plaintiff manufactures ink for Defendants' printhead system—the tying product—does not mean there are no substitutes or competitors in the tying product market. Whether Plaintiff's ink—the tied product—is designed for use with Defendants' printhead system is not relevant in defining the tying product market.[16]

Plaintiff also attempts to define the market by citing a series of marketing materials and investment reports discussing "the market." For example, Trident's "1998 Marketing Plan" references the "impulse ink jet printhead market." O'Connor Decl., Ex. 2. A small cap investment report refers to Trident as being in the "emerging impulse ink jet market." O'Connor Decl., Ex. 3. An investment analyst's presentation to Trident's board of directors referred to the "overall ink jet market." O'Connor Decl., Ex. 4. However, for antitrust purposes, the relevant market cannot be defined by a defendant's marketing materials or from the opinions of investment analysts. "For antitrust purposes ... the relevant market is determined by reasonable interchangeability, as evidenced by cross-elasticity of demand and supply, not by laymen's comments made in a competitive business environment." *AD/SAT v. Associated Press*, 920 F.Supp. 1287, 1297 n. 7 (S.D.N.Y.1996), *aff'd*, 181 F.3d 216 (2d Cir.1999) (dismissing "internal documents" in which Defendants' officers stated they hope to "capture" a certain market.). *See also Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 782–84 (5th Cir.1999) (court disregarded evidence that Defendants' officers, employees, customers, and internal documents defined market in certain way,

focusing instead on "market realities"); *Nobel Scientific Indus.*, 670 F.Supp. at 1318–19, *aff'd*, 831 F.2d 537 (4th Cir.1987) ("Product markets for antitrust analysis depend on cross-elasticity and interchangeability, and so the fact that a company may refer to a 'market' does not necessarily mean that its reference will be to a market for the purposes of the Sherman Act."). "Construction of a relevant economic market or a showing of monopoly power in that market cannot ... be based upon lay opinion testimony." *American Key Corp. v. Cole Nat. Corp.*, 762 F.2d 1569, 1579–80 (11th Cir.1985). *See also Colsa Corp. v. Martin Marietta Servs., Inc.*, 133 F.3d 853, 855 n. 4 (11th Cir.1998) (court rejected testimony of two witnesses about market definition as "lay opinion testimony"); *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1490 (9th Cir.1991) (court rejected testimony of two witnesses about market definition because there was "no evidence that those two principals were experts qualified to opine on a highly technical economic question.").

Plaintiff cannot define the market without examining the range of substitutes for Defendants' product from the perspective of OEMs and end users, the consumers of Defendants' printhead systems. Plaintiff also cannot define the market without considering potential sources of supply for these consumers, *viz.*, whether firms currently manufacture or could begin manufacturing the same product or close substitutes, like labeling machines. Plaintiff must proffer "market data, figures or other relevant material adequately describing

---

**16.** Plaintiff's argument that the market is defined by Defendants' printhead system is more relevant to its claim that Defendants attempted to monopolize the market for ink. *See Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 482–83, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) ("Because service and parts for Kodak equipment are not interchangeable with other manufacturers' service and parts, the relevant market from the Kodak equipment owner's perspective is composed of only those companies that service Kodak machines."). This argument is addressed in Section IV.1.

the nature, cost, usage, or other features of competing products" to determine the bounds of the relevant market. *Bhan v. NME Hosps., Inc.*, 669 F.Supp. 998, 1018 (E.D.Cal.1987), *aff'd*, 929 F.2d 1404 (9th Cir.1991). Plaintiff's failure to address the range of substitutes that exist for Defendants' patented printhead systems prevents it from defining the relevant product market and precludes it as a matter of law from establishing market power by virtue of Defendants' market share.

### 2. Plaintiff Fails To Define the Geographic Market for the Tying Product

■ Plaintiff proffers no evidence concerning the relevant geographic market, also a prerequisite to calculating Defendants' market share. A geographic market is the area in which the product and its reasonably interchangeable substitutes are traded. *T. Harris Young & Assocs., Inc. v. Marquette Elecs., Inc.*, 931 F.2d 816, 823 (11th Cir.1991). Geographic market definition is based upon the market area in which the seller and its competitors operate and consumers "can practicably turn for supplies." *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 357, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963). Defining a geographic market requires an analysis of "[p]rice data and such corroborative factors as transportation costs, delivery limitations, customer convenience and preference, and the location and facilities of other producers and distributors." *T. Harris Young*, 931 F.2d at 823.

Plaintiff provides no evidence or analysis of the relevant geographic market. Plaintiff merely asserts that the geographic market for the tying product is the United States and Canada, which Defendants' dispute. However, Plaintiff must proffer some credible evidence concerning the geographic market at issue. *See, e.g., Morgan, Strand, Wheeler & Biggs*, 924 F.2d at 1490 (court rejected Plaintiff's asserted geographic market definition, as it was supported by no evidence and only lay witness testimony). Plaintiff's failure to develop any evidence concerning the relevant geographic market definition is fatal to its case.

### 3. Plaintiff Fails To Show that Defendants Possess a Dominant Market Share

Plaintiff makes no attempt to calculate Defendants' market share or to show that Defendants control a dominant share of the tying product market. Plaintiff proffers no economic evidence or quantitative data in support of its allegations. Plaintiff also concedes that it retained no experts for purposes of defining the relevant market or determining Defendants' market share. The fact that Plaintiff makes no attempt to define the market makes it impossible for Plaintiff to prove that Defendants possess sufficient market share in the tying product to exercise market power.[17]

Plaintiff attempts to create a triable issue of fact by quoting portions of Trident's

---

**17.** Although the Supreme Court has identified potential sources of market power, it has not clearly articulated a standard as to what constitutes sufficient economic power to force a tie. *See* Christopher R. Leslie, *Unilaterally Imposed Tying Arrangements and Antitrust's Concerted Action Requirement*, 60 OHIO ST.L.J. 1773, 1830–36 (1999). A persuasive argument may be made that "[t]he most appropriate test to determine whether any individual has sufficient market power to force consum-

ers to accept a tie-in is the 'monopoly power' standard of Section Two jurisprudence." *Id.* at 1831. The Court might well agree with this proposition, as it has previously acknowledged that "the essence of illegality in tying agreements is the wielding of monopolistic leverage." *Times–Picayune Publ'g*, 345 U.S. at 611, 73 S.Ct. 872. Regardless, Plaintiff cannot establish Defendants possess market power because it does not define the relevant market.

president's deposition and Trident's marketing and investment materials, which purportedly evidence Defendants' market power. Plaintiff also proffers documents suggesting that Defendants sell a certain percentage of the printheads and spare parts in existence. As stated above, however, without a definition of the relevant market, such out-of-context statements are meaningless.[18]

Plaintiff's anecdotal evidence from marketing and investment materials is unpersuasive for the same reason. Advertisements that Trident has a dominant "market position" or is a leader in the "overall ink jet market," "impulse ink jet printhead market," "emerging impulse ink jet market," "piezo-electric ink jet" market, or "ink jet bar coding" market evidence nothing, because Plaintiff does not establish that these labels accurately describe the relevant product market for purposes of an antitrust analysis. By not defining the relevant market, Plaintiff cannot prevail as a matter of law. Moreover, non-economic, qualitative descriptions of market success are insufficient to establish that an antitrust defendant exercises market power. *See, e.g., Colsa Corp.*, 133 F.3d at 855 n. 4 ("[A] showing of monopoly power in that market cannot ... be based upon lay opinion testimony."); *Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, 28 F.3d 1379, 1383–87 (5th Cir.1994) ("[G]eneral descriptions of market success" indicating defendant's product was "market leader," as well as the "lead," "premiere," "flagship," and "dominant" product insufficient to establish market power because they did not establish "share of the market [defendant] controlled or the nature of the competition [defendant] faced."); *Forro Precision, Inc. v. International Bus.*

*Machs. Corp.*, 673 F.2d 1045, 1059 (9th Cir.1982) ("Without the benefit of expert testimony or other credible evidence to support an inference of market power, ... any such inference would be sheer speculation."). Accordingly, Plaintiff cannot establish that Defendants possess a dominant share of the market.

*4. Plaintiff Identifies no Barriers to Entry*

Plaintiff does not demonstrate that the market has significant barriers to entry or that existing competitors lack the capacity to increase their output in the short run. *See Rebel Oil*, 51 F.3d at 1434. Plaintiff argues that the market has barriers to entry, a prerequisite to establishing market power through a defendant's market share. *See id.* Plaintiff cites a Trident document stating:

"Barriers to entry of a competitor into Trident's markets are considerable. Our technology required an initial investment of approximately $20m and at least $10m of on-going R & D and process development. This work resulted in an extensive portfolio of patents and confidential know-how. All of the impulse ink jet printheads on the market today required similar or higher investments."

O'Connor Decl., Ex. 8. Without a proper definition of the market, however, this document cannot establish that the relevant product market *in its entirety* has barriers to entry. Plaintiff's proffered evidence likely establishes only that a competitor wishing to design the same product as Defendants (*i.e.*, printers that print bar codes), as opposed to its potential substitutes (*i.e.*, labeling systems), faces significant costs. However, it is undisputed that

---

**18.** Thus, even assuming Trident had over 90% of the "piezo ink jet engine[s]" for "industrial printing," as Plaintiff contends, Plaintiff has not, in fact, established that this is the relevant market for purposes of the Sherman Act.

potential barriers to entry, including Defendants' patent, did *not* prevent Markem and Xaar from developing a printhead that performs the same task as Defendants' printhead. Moreover, Plaintiff proffers no evidence that those who manufacture a comparable product or potential substitutes lack the capacity to increase their output. In short, Plaintiff cannot establish that the relevant market—however defined—has barriers to entry.

### 5. *Conclusion*

With respect to Plaintiff's claim of unlawful tying in violation of Section 1 of the Sherman Act, Plaintiff's only effort to establish Defendants' market power is by virtue of their patent. Plaintiff cannot, as a matter of law, establish Defendants' market power by virtue of their market share, as Plaintiff makes no attempt to define the product market or the geographic market. Nor does Plaintiff cite any unique element of Defendants' product that would support a finding of market power. *See, e.g., United States Steel Corp. v. Fortner Enterprises, Inc.,* 429 U.S. 610, 620–22, 97 S.Ct. 861, 51 L.Ed.2d 80 (1977) (*"Fortner II"*). It is unlikely that such uniqueness exists in this case, as Markem and Xaar were able to develop printheads that perform the same task as Defendants' printhead.

Nor can Plaintiff create a triable issue of fact by citing a series of non-economic, qualitative marketing and investment materials which refer generally to Trident's position in "the market." *Alcatel USA,* 166 F.3d at 782–84; *Colsa Corp.,* 133 F.3d at 855 n. 4; *Roy B. Taylor Sales,* 28 F.3d

at 1383–87. Simply put, Plaintiff proffers no evidence that would establish Defendants' market power in the as yet undefined market for the tying product.

In sum, Plaintiff proffers no evidence from which a reasonable trier of fact could define the relevant product and geographic markets. Nor does Plaintiff proffer any evidence that Defendants possess market power by virtue of their market share or that the market for the tying product contains barriers to entry. Accordingly, the court **GRANTS** Defendants' motion for summary judgment on Plaintiff's claim under Section 1 of the Sherman Act.

### IV. PLAINTIFF'S SECTION TWO CLAIM—DEFENDANTS' ALLEGED MONOPOLIZATION OF INK

Defendants also move for summary judgment on Plaintiff's claim that Defendants monopolized, attempted to monopolize, and conspired to monopolize "the market for commercial ink jet inks" in violation of Section 2 of the Sherman Act.[19] Fourth Amended Complaint ¶ 19. "The offense of monopoly under § 2 of the Sherman Act has two elements: 1) the possession of monopoly power in the relevant market and 2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 480–81, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (citing *United States v. Grinnell Corp.,* 384 U.S. 563,

---

**19.** Plaintiff did not move for summary judgment on its Section 2 claim or proffer any evidence in support of its allegations that Defendants monopolized, attempted to monopolize, or conspired to monopolize the tying product market or the market for ink containers. Moreover, as discussed above, Plaintiff cannot establish that Defendants had "mo-

nopoly power" in the market for the tying product for purposes of Section 2 of the Sherman Act, because it cannot make the lesser showing that Defendants had "market power" in any defined market for purposes of section 1 of the Sherman Act. *See Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 481, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992).

570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966)). In order to establish that Defendants attempted to monopolize the ink market, Plaintiff must demonstrate that Defendants had a "dangerous probability of success." *See Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 454–60, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993).

### 1. Plaintiff Proffers no Evidence Defining the Relevant Product Market

Citing no authority and undertaking little analysis, Plaintiff argues that the relevant product market is defined by Defendants' patented printhead system. In other words, Plaintiff contends that Defendants monopolized, attempted to monopolize, and conspired to monopolize the market for "ink ... which is used in Defendants' patented piezoelectric printing system, including ink which can be used to refill Defendants' patented containers." Fourth Amended Complaint ¶ 21; Wystma Decl., Ex. C. (Admission No. 58) ("The market is ink for use in conjunction with Trident's piezoelectric printhead system.").

■■■ A single brand of a product can be a relevant market for purposes of the Sherman Act. *See Eastman Kodak,* 504 U.S. at 482–83, 112 S.Ct. 2072. However, such a market definition can be determined "only after a factual inquiry into the 'commercial realities' faced by consumers." *Id.* at 482, 112 S.Ct. 2072. As discussed in Section III.B.1, product market definition requires an analysis of both cross-elasticity of demand and cross-elasticity of supply. *Brown Shoe Co. v. United States,* 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). The record in the instant case suggests that Plaintiff's proposed market definition was derived not from economic analysis of cross-elasticity of supply and cross-elasticity of demand, but rather from a report prepared by Plaintiff's vice president in a few hours. *See* Wystma Decl.,

Ex. B, Strong Depo. at 46–47, 112–16; Wystma Decl., Ex. J at 122; Wystma Decl., Ex. N; Plaintiff's Response to Defendants' Statement of Uncontroverted Facts, December 4, 2001, at ¶ 10. Indeed, Plaintiff concedes that its expert "did not perform an antitrust analysis at all." Plaintiff's Response to Defendants' Statement of Uncontroverted Facts, December 4, 2002, at ¶ 10.

Nevertheless, the record contains sufficient facts to determine the cross-elasticity of demand. It is undisputed that Trident's printhead system uses a specially-formulated ink. Trident's printhead system cannot use ink formulated for other printers, and other printers cannot use ink that is specially formulated for Trident's system. Accordingly, the relevant product market from the consumer's perspective likely contains only ink that is specially formulated for Trident printhead systems. *See Eastman Kodak,* 504 U.S. at 482–83, 112 S.Ct. 2072 ("Because service and parts for Kodak equipment are not interchangeable with other manufacturers' service and parts, the relevant market from the Kodak equipment owner's perspective is composed of only those companies that service Kodak machines.").

However, "defining a market on the basis of demand considerations alone is erroneous. A reasonable market definition must also be based upon 'supply elasticity.'" *Rebel Oil Co., Inc. v. Atlantic Richfield Co.,* 51 F.3d 1421, 1436 (9th Cir.1995) (citations omitted). "If the producers of product X can readily shift their production facilities to produce product Y, then the sales of both should be included in the relevant market." *Id.* In the instant case, Plaintiff proffers no evidence, analysis, or discussion of Trident's actual competitors, or the market's potential entrants. Citing no authority, Plaintiff contends that cross-elasticity of supply is not relevant in this

case, and that the Ninth Circuit's holding to the contrary in *Rebel Oil* applies only to predatory pricing cases. *See* Plaintiff's Supplemental Brief, March 28, 2002, at 4–5. However, a plaintiff must define the product market in a monopolization case predicated upon a defendant's market share, requiring an analysis of cross-elasticity of supply. *See, e.g., Brown Shoe,* 370 U.S. at 325, 82 S.Ct. 1502.

■ The record reflects that there are numerous actual and potential suppliers of ink for Trident's system. Various ink manufacturers have offered ink for use in Trident's printhead system, including Plaintiff, Graphic Controls, Squid Ink, Renewable Resources, and ATG. *See, e.g.,* Wystma Decl., Ex. C (Admission No. 26); Brucker Depo., July 24, 2000, at 145–46; Brucker Depo., July 25, 2000, at 97; O'Connor Decl., February 11, 2002, Exs. 5, 6, 36; Defendants' Statement of Uncontroverted Facts, November 13, 2001, at ¶ 15. Plaintiff also concedes that ink manufacturers could convert their facilities to manufacture ink for Trident's system. *See* Brucker Depo., July 24, 2000, at 146; Brucker Depo., July 25, 2000, at 107–08. By not addressing the cross-elasticity of supply, Plaintiff cannot, as a matter of law, define the relevant product market, an omission fatal to its Section 2 claims for monopolization and attempted monopolization.[20]

### 2. Plaintiff Proffers no Evidence Defining the Relevant Geographic Market

Plaintiff's failure to proffer evidence or analysis concerning the relevant geographic market is also fatal to its Section 2 claim. As discussed above, geographic market for antitrust purposes is the market area in which the seller and its competitors operate and consumers "can practicably turn for supplies." *United States v. Philadelphia Nat'l Bank,* 374 U.S. 321, 357, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963). Geographic market definition requires analyzing, *inter alia,* "[p]rice data and such corroborative factors as transportation costs, delivery limitations, customer convenience and preference, and the location and facilities of other producers and distributors." *T. Harris Young & Assocs., Inc. v. Marquette Elecs., Inc.,* 931 F.2d 816, 823 (11th Cir.1991).

Plaintiff does not analyze or discuss the relevant geographic market for the ink at issue, and the record contains no evidence from which the geographic market could be defined. Nor is the geographic market in this case clearly defined as the United States and Canada, as Plaintiff contends and Defendants dispute. Market definition cannot rely entirely upon bald assertions or lay opinion, and Plaintiff must proffer some credible evidence concerning the geographic market at issue. *See, e.g., Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.,* 924 F.2d 1484, 1490 (9th Cir.1991) (court rejected Plaintiff's asserted geographic market definition, as it was supported by no evidence and only lay witness testimony). By providing no evidence or analysis of the relevant geographic market definition, Plaintiff provides no basis for denying Defendants' motion for summary judgment of its claims under Section 2 of the Sherman Act.[21]

### 3. Plaintiff Does Not Establish that Defendants Possessed Monopoly Power

In the absence of evidence from which a reasonable trier of fact could define the

---

20. As Trident points out, end users are not bound by the tying arrangements between Trident and the OEMS. *See* Defendants' Supplemental Brief, March 22, 2002.

21. Claims for attempted monopolization also require that the plaintiff define the product and geographic markets. *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 459–60, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993).

market, Plaintiff cannot establish that Defendants possessed monopoly power through their market share. In order to establish monopolization by virtue of Defendants' market share, Plaintiff must show that Defendants' market share effectively confers monopoly power, *viz.*, the power to raise prices and restrict output. *See Eastman Kodak,* 504 U.S. at 464, 112 S.Ct. 2072. Although courts have not defined an exact percentage of market share that necessarily confers monopoly power, Judge Learned Hand recognized that "[90% market share] is enough to constitute a monopoly; it is doubtful whether sixty or sixty-four percentage would be enough; and certainly thirty-three percent is not." *United States v. Aluminum Co. of Am.,* 148 F.2d 416, 424 (2d Cir.1945).

■ Plaintiff proffers no relevant evidence that Defendants' possessed monopoly power in any defined market. Plaintiff, who concedes it did not retain expert witnesses to analyze the markets or determine Defendants' market share, attempts to prove that Defendants possessed monopoly power by citing to a series of statements contained in Trident's marketing materials, strategic business plans, and investment reports. *See* O'Connor Decl., February 11, 2002, Ex. 8 ("Presentation to the Board of Directors" by securities analyst), Ex. 9 (securities analyst's opinion whether to invest in Trident), Ex. 10 (Trident's "Strategic Business Plan"), Ex. 11 ("Trident International 1998 Marketing Plan"), Ex. 12 ("Institutional Marketing Materials" prepared by Prudential Securities for use in Trident's initial public offering), Ex. 13 (Trident's prospectus, provided to potential investors), Ex. 14 ("Monthly Management Report" containing no quantitative data), Ex. 15 (internal memo discussing cost of designing printheads), Ex. 16 (securities analyst's opinion whether to invest in Trident), Ex. 17 (Prudential Securities' opinion whether to invest in Trident), Ex. 18 (presentation to Trident's board of directors). However, as discussed in Section III.B.3, Plaintiff cannot rely upon qualitative promotional materials, in lieu of economic analysis or quantitative evidence, to establish that Defendants possessed monopoly power. *Forro Precision, Inc. v. International Bus. Machs. Corp.,* 673 F.2d 1045, 1059 (9th Cir.1982) ("Without the benefit of expert testimony or other credible evidence to support an inference of market power, ... any such inference would be sheer speculation."). *See also Colsa Corp. v. Martin Marietta Servs., Inc.,* 133 F.3d 853, 855 n. 4 (11th Cir.1998) ("[A] showing of monopoly power in that market cannot ... be based upon lay opinion testimony."); *Roy B. Taylor Sales, Inc. v. Hollymatic Corp.,* 28 F.3d 1379, 1383–87 (5th Cir.1994) ("[G]eneral descriptions of market success" indicating defendant's product was "market leader," as well as the "lead," "premiere," "flagship," and "dominant" product insufficient to establish market power because they did not establish "share of the market [defendant] controlled or the nature of the competition [defendant] faced.").

Moreover, in the absence of a defined market, qualitative or quantitative estimates of market share are meaningless. Thus, a securities analyst's representation that "Trident is the leader in piezo-electric ink jet" or that "[Trident] derives [a] substantial portion of its revenues from sale of consumables" reveals nothing about market share. *See e.g., id.,* Ex. 8. Nor do documents purportedly showing that Trident sold approximately 80% of high-resolution ink between 2000 and 2001 assist in establishing Defendants' market share. *See id.,* Exs. 5–6. Although this percentage may represent Trident's ink sales, this figure does not accurately reflect Trident's *market share,* as it does not account for cross-elasticity of supply. As Plaintiff concedes, ink manufacturers could convert

their facilities to manufacture high-resolution ink, undermining its argument that Trident acquired monopoly power or had a "dangerous probability of success" in doing so. *See* Brucker Depo., July 24, 2000, at 146; Brucker Depo., July 25, 2000, at 107–08. Indeed, various manufacturers offer ink for use in Trident's printhead system, including Plaintiff, Graphic Controls, Squid Ink, Renewable Resources, and ATG. *See, e.g.,* Wystma Decl., Ex. C (Admission No. 26); Brucker Depo., July 24, 2000, at 145–46; Brucker Depo., July 25, 2000, at 97; O'Connor Decl., February 11, 2002, Exs. 5, 6, 36; Defendants' Statement of Uncontroverted Facts, November 13, 2001, at ¶ 15.[22]

In short, Plaintiff proffers no evidence of Trident's market share in any defined market. Plaintiff presents no evidence that Defendants had either "monopoly power" or a "dangerous probability of success" of monopolizing any such market by virtue of their market position. Nor does Plaintiff proffer any evidence of a conspiracy to monopolize any defined market.[23]

## V. CONCLUSION

Based upon the foregoing, Plaintiff's motion for summary judgment of its second claim for violations of Section 1 of the Sherman Act is **DENIED.** Defendants' motion for summary judgment of Plaintiff's second and third claims for violations of Section 1 and Section 2 of the Sherman Act, respectively, is **GRANTED.**

IT IS SO ORDERED

**22.** Plaintiff complains that Trident does not warranty its printhead system for use with third-party inks. However, merely limiting or voiding a product's warranty based upon consumer use of third-party consumables does not violate the antitrust laws. *See, e.g., Marts v. Xerox, Inc.,* 77 F.3d 1109, 1112 (8th Cir. 1996) (Xerox's policy of conditioning its photocopiers' service warranties upon consumers using Xerox cartridges did not violate antitrust laws).

**23.** Plaintiff argues that Defendants' tying arrangements with the OEMs constitute a barrier to entry. The court need not address potential barriers to entry facing a competitor who wishes to sell ink for use in conjunction with Trident's printhead system (*i.e.,* Defendants' tying arrangements, Defendants' alleged misrepresentations that third-party inks corrode Trident's printheads, or the fact that Trident's printheads use single-use ink containers), because Plaintiff's failure to define either the product market or the geographic market is fatal to its case.